UNITED STATES of America

v.

Frank L. MARRAPESE, Jr., also known as "Bobo," and John F. Cicilline.

Crim. No. 85–015–01, 85–015–02–S.

United States District Court, D. Rhode Island.

June 11, 1985.

Edwin J. Gale, Sp. Atty., U.S. Dept. of Justice, Lincoln C. Almond, U.S. Atty., Providence, R.I., for plaintiff.

Joseph J. Balliro, Boston, Mass., John F. Sheehan, Providence, R.I., for J.F. Cicilline.

Richard M. Egbert, Boston, Mass., Edward J. Romano, Providence, R.I., for F.L. Marrapese.

## OPINION AND ORDER

SELYA, District Judge.

In February of 1985, the defendants herein, Frank L. Marrapese, Jr. and John F. Cicilline, were indicted by a grand jury in this district on charges of obstructing justice, 18 U.S.C. § 1503, and conspiring to suborn perjury and obstruct justice in violation of 18 U.S.C. § 371. They have moved to dismiss the indictment, arguing that the grand jury selection process was flawed, that the composition of the grand jury was unlawful, that the sitting grand jury was subjected to unfair manipulative influences, and that the grand jury's term had expired at the time the indictment was returned. The court took the matter under advisement following an evidentiary hearing, prolific briefing, and oral argument.

## I. THE SELECTION PROCESS.

The Juror Selection Plan for the district of Rhode Island, effective October 15, 1975, as amended effective February 1, 1982 (Plan), states in substance that the clerk of the court shall manage the jury selection process under the supervision and control of the Chief Judge. In March, 1982, the clerk's office requested the Division of Information Processing of the state of Rhode

Island to compile two rosters of names, randomly selected from the state's voter registration lists. The state complied. One listing, consisting of 5000 names, thereafter became the court's petit jury master wheel. The second listing of 1000 names formed the raw material for the court's grand jury master wheel. This district has apparently used separate wheels for petit and grand jury selections since at least 1973.

Following receipt of the names and computer-generated questionnaires from the state, the clerk's office divided the prospective grand jury roster roughly in half through a random process. This was done pursuant to a directive from the Administrative Office of the U.S. Courts recommending that juror questionnaires be mailed in groups of about 500, rather than all at once, as a means to preserve the public fisc. Accordingly, 447 randomly-selected questionnaires were mailed to prospective grand jury veniremen; the remaining 553 questionnaires were reserved for later use if additional qualified jurymen proved to be required. Of the 447 mailed questionnaires, 37 were returned to the clerk's office as undeliverable.

After the remaining questionnaires had been completed and returned, the clerk's office began the qualification process. The Plan provided that "excuse or deferment of service may be granted upon individual request" for:

(1) all persons over seventy years of age;

(2) all ministers of the gospel and members of religious orders, actively so engaged;

(3) all attorneys, physicians, surgeons, dentists, veterinarians, pharmacists, nurses, and funeral directors, actively so engaged;

(4) all persons who have served as grand or petit jurors in a state or federal court within the preceding two years;

(5) all school teachers in public, parochial or private schools, actively so engaged;

(6) all persons who do not have adequate means of transportation to the place of holding court;

(7) all women who are caring for a child or children under the age of sixteen years;

(8) all sole operators of businesses.

The Plan further stipulated that only those persons who were exempted from jury service under 28 U.S.C. § 1863(b)(6) would be entitled to exemption as of right. The Plan summarized those classes of individuals as follows:

(1) members in active service in the Armed Forces of the United States;

(2) members of the fire or police departments of any state, district, territory, possession or subdivision thereof;

(3) public officers in the executive, legislative, or judicial branches of the Government of the United States, or any state, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties....

At the times material hereto, the clerk of this court held a dual appointment as clerk/part-time magistrate. The clerk/magistrate acquainted staff members who were assigned to work on the qualification process with a variety of general guidelines. These instructions were principally oral. In this instance, the deputy clerk who was given the initial first-line responsibility for screening juror responses also used a written sheet of guidelines provided by another deputy clerk.

Armed with these instructions, the deputy clerk reviewed each questionnaire. Based on the information provided on the forms, she divided the replies into three categories. The questionnaires which, on their face, reflected the respondents' eligibility to serve, and which did not appear to present any issues as to absolution, were placed in one group. A second array intermixed both those who were exempt and those who were not only excusable, but also likely to be excused based on the guidelines given to the deputy. And, those individuals whose status seemed proble-

matic were placed in the third category. The clerk/magistrate then personally reviewed all of the doubtful cases and made final decisions. In addition, he reviewed some indeterminate number of the questionnaires which had been placed in the tentatively disqualified grouping. His estimate that he probably scanned as many as 70% of these proffers seems creditworthy. In those cases where he did not feel that the grounds for excusal merited such treatment, the questionnaires were added to the qualified pile.

In the wake of this credentialling process, 231 grand jurors were deemed qualified and available for grand jury service. (Twelve of the acceptable questionnaires were inadvertently misplaced in the pile of disenfranchised forms, and these otherwise qualified individuals were not listed as such in the computer.) The grand jury annulus was initially formulated on this basis. In October, 1983, the first grand jury was drawn from the master wheel so constituted, again at random, and nearly 50 persons were summoned for service. The persons so summoned were excluded from further grand jury drawings, whether or not actually seated as members of the October, 1983 grand jury. The number of available grand jurors in the pool thus shrunk by 47.

The grand jury which indicted these defendants was the second grand jury to be selected from this master wheel. Prospective members were summoned to report on April 27, 1984. In line with customary practice, this venire was randomly selected from the names remaining in the master wheel. Before the return date, a few persons were excused from attendance by the deputy clerks after consultation in each instance with the clerk/magistrate; others were excused on the day of empanellment by the clerk/magistrate upon the consent of the presiding district judge. None of these post-summons dismissals have been specifically challenged by the movants. Twenty-three grand jurors were seated and sworn.

After the April, 1984 empanelling, the United States Attorney's office pulled the laboring oar, as has been the protocol in this district for many years (the memory of living man runneth not to the contrary), in notifying talesmen of scheduled sittings and in keeping a truancy count (although the clerk's office maintained payroll records of grand jury attendance to insure that jurors were properly compensated). If a grand juror received notice of a planned session and felt that he or she could not attend, the juror would simply notify the United States Attorney's office in advance. The reasons underlying inability to appear are varied—e.g., illness, absence from the district, familial or business exigencies—and are not independently verified. Jurors are, it seems, taken at their word. If a juror fails to report for a scheduled sitting without any forewarning, that juror is marked as "absent" rather than as "excused." So long as the number of grand jurors does not shrink to such an extent that the statutory quorum requirement is in jeopardy, see 18 U.S.C. § 3321; Fed.R. Crim.P. 6(a), the United States Attorney routinely honors tendered excuses and, insofar as appears of record here, does not attempt to discipline those who may be absent without leave. On the day of the scheduled sitting, the grand jurors check in at the clerk's office before proceeding to the grand jury room.

On February 20, 1985, when the evidence pertaining to this indictment was taken, four grand jurors were not present. The records indicate that of the four absentees, one individual had not attended since August, 1984 (when he had moved out of state and informed the prosecutor of that fact). Two of the other grand jurors had telephoned in advance to say that they could not attend; one was on vacation, the second had planned an out of town business trip. The fourth juryman was simply absent. Accordingly, nineteen grand jurors were present. They unanimously voted a true bill with respect to the indictment at bar.

## II. THE STATUTORY CHALLENGE.

### A. *Procedural Aspects*

The Jury Selection and Service Act of 1968, as amended, 28 U.S.C. §§ 1861–1877

(1985 Supp.) (the Act), establishes strict procedural requirements for motions to dismiss an indictment because of alleged grand jury irregularities. Such a motion must be filed "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, ..." 28 U.S.C. § 1867(a). *See also* Fed.R. Crim.P. 6(b)(2). The instant motions appear to be timely filed. (The grand jury indictment was returned on February 20, 1985. The court granted the defendants' petitions to extend the time for the filing of motions to March 11. On March 4, 1985, the defendants filed their preliminary motions to dismiss the indictment.)

█ Yet, over and above the timeliness requirement, a motion to dismiss the indictment must also contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, ..." 28 U.S.C. § 1867(d). In this circuit, that requirement has been strictly interpreted; the absence of the sworn statement precludes a statutory challenge to the grand jury selection process. *United States v. Foxworth*, 599 F.2d 1, 3 (1st Cir.1979); *United States v. Marcano*, 508 F.Supp. 462, 465 (D.P.R. 1980). *See also United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir.), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

█ The defendants' preliminary motions to dismiss were accompanied by the sworn statement of Edward Romano, local counsel for the defendant Marrapese, outlining what he believed were improprieties in the grand jury selection process. The government argues that Attorney Romano's statement does not conform to the real meaning and intendment of 28 U.S.C. § 1867(d). In the government's view, the Romano statement merely asks the court to assume that, because these may have been irregularities in the grand jury selection process at an earlier time, there were irregularities in this selection process as well. Attorney Romano declared that he

was "noble [sic] to check the documents and the records necessary to attack the instant Grand Jury," but that he believed it was flawed.

There is a dearth of caselaw as to the required form or content of such a statement of facts. In this case it appears to the court's satisfaction that Romano's declaration was made simply in an attempt to preserve the defendants' claim under 28 U.S.C. § 1867(a); it was not intended to apprise the court of the circumstances of an actual and substantial failure of the process. Rather than a dispassionate recital of objective fact, Romano proffered a perfervid polemic, which was both subjective and conclusory in nature.

The sworn statement requirement was plainly included as a means of discouraging factitious challenges. *See Kennedy*, 548 F.2d at 613. As the legislative history concerning the point makes abundantly clear:

> This threshold requirement to a successful challenge will make it possible for the judge to review a challenged motion and swiftly dispose of it if it fails, on its face, to state a case for which a remedy could be granted.

H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News, pp. 1792, 1806; S.Rep. 891, 90th Cong., 1st Sess. 33 (1967).

It strikes the court as surpassingly strange that Congress would have taken the pains to mandate that a sworn statement of facts was required to pursue such a course, and that a defendant could then elude the sentry at the statutory gates by the simple expedient of having an attorney swear to conjecture, speculation, and surmise. In this circuit, courts have refused to accept academically prepared, unsworn reports on jury selection procedures as sworn statements within the meaning of 28 U.S.C. § 1876(d). *See, e.g., Foxworth*, 599 F.2d at 3; *Marcano*, 508 F.Supp. at 465. Other tribunals have held that the issue of fair representation is not properly raised by a conclusory oral objection interposed at the beginning of trial. *E.g., United States*

*v. Green*, 742 F.2d 609, 612 (11th Cir.1984). *See United States v. D'Alora*, 585 F.2d 16, 22 (1st Cir.1978). And, even where the defendant had made an offer of proof and requested permission to subpoena witnesses, his failure to file a motion containing a sworn statement of facts has been held to be fatal under 28 U.S.C. § 1867(d). *United States v. Jones*, 480 F.2d 1135, 1139 (2d Cir.1973). Finally, citing Fed.R.Crim.P. 6 (which places the burden on a defendant to show that grounds for dismissal may exist), at least one trial court has found that counsel's statement that "experience has taught us that areas of grand jury due process investigated in this application are well-identified sectors where serious abuses have occurred in the past" did not suffice to overcome the presumption of regularity surrounding grand jury proceedings. *United States v. Olin Corp.*, 465 F.Supp. 1120, 1134 (W.D.N.Y.1979). There does not seem to be much difference between counsel's statement in *Olin* and the speculative jeremiad authored by Attorney Romano.

To the extent that Marrapese and Cicilline rely on a purely statutory right, their remedy is statutorily defined. As Congress has ordained: "The procedures prescribed by this section shall be the *exclusive* means by which a person accused of a federal crime, ... may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." 28 U.S.C. § 1867(e) (emphasis supplied). "Compliance with these express statutory requirements is necessary to question the validity of a plan adopted and approved pursuant to the Jury Selection and Service Act." *D'Alora*, 585 F.2d at 22, quoting *Jones*, 480 F.2d at 1139. *See also United States v. Rodriguez*, 588 F.2d 1003, 1009 (5th Cir.1979).

To be sure, there are some extenuative circumstances here—but the blade cuts both ways. Although Romano did point to some evidence of questionable practices in-

volving a prior grand jury in this very case,[1] those references added little of substance to the claimed deficit in this grand jury. Of greater significance, the previous skirmish meant, of course, that these defendants were on notice of the potential problem from the moment this indictment was handed up. And, at the same time, the difficulties anent the earlier grand jury should have made defense counsel's task considerably easier in spotting the areas of likely controversy, in assembling data, and in constructing, on a timely basis, a meaningful sworn statement sufficient to meet the strictures of § 1867(d). Then, too, the court, upon request, afforded the defendants extra time for this exact purpose.

Congress did not lightly impose either the sworn statement requirement or the exacting temporal limitations contained in the Act. Those provisions serve salutary purposes in expediting trial of criminal cases, in guarding against stale challenges, in preventing delay, and in protecting the rights of the public. Under the statutory scheme, § 1867 ministers to the vigilant—not to those who sleep upon their perceptible rights. The time limits of the Act cannot be evaded by empty ritualistic gestures such as the filing of a conclusory set of suppositions.

The defendants in this case have not met the prerequisites for the statutory challenge which they endeavor belatedly to mount. The facts upon which they now rely were discoverable by them, had they exercised due diligence, within a few days of their indictment. Indeed, they had every reason to be immediately alert to the line of defense. They have offered nothing which suffices to excuse their tardiness. They cannot close the barn door after allowing the horse to gallop away.

Although the instant motions are, in this court's view, barred by the failure seasonably to file a sworn statement of facts in

---

**1.** These defendants had previously been indicted by an earlier grand jury on substantially the same charges. *See United States v. Marrapese*, Cr. No. 83–037–S (D.R.I. May 12, 1983). In the course of proceedings in the prior case, ques-

tions arose as to the composition of the grand jury which had returned the indictment. Those precise questions were mooted when the instant (superseding) indictment was handed up and the predecessor case dismissed.

compliance with 28 U.S.C. § 1867(d), prudential considerations dictate that the merits nevertheless be examined. Such consideration is indicated by the importance of the issues presented vis-a-vis the validity *vel non* of other indictments returned by the same grand jury, by the interests of judicial economy (this court having taken evidence on the merits of the statutory challenge), and by the fact that the passage of time is in any event insufficient to vitiate either the defendants' constitutional claims, *see* 28 U.S.C. § 1867(e), or their essentially jurisdictional contention that the term of the October, 1984 grand jury had expired by the time they were indicted. The court therefore turns to the substance of the motions.

### B. *Merits of the Statutory Challenge*

The defendants claim that the selection and subsequent management of this grand jury violated both the Act and the Plan. Under the Act, a challenged indictment may be dismissed only when there has been "a substantial failure to comply" with the statutory provisions in selecting the grand or petit jury. 28 U.S.C. § 1867(a). Such a "substantial" default in compliance occurs when the alleged violations subvert the underlying principles of the Act. *See generally United States v. Bearden*, 659 F.2d 590, 600 (5th Cir.1981), *cert. denied*, 456 U.S. 436, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982); *United States v. Maskeny*, 609 F.2d 183, 191 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112, *reh. denied*, 448 U.S. 912, 101 S.Ct. 27, 65 L.Ed.2d 1173 (1980); *United States v. Davis*, 546 F.2d 583, 589 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). According to the legislative history, the Act requires:

(1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 1792, 1793.

■ As the Fifth Circuit has emphasized, a substantial violation exists only when these principles are frustrated; "[m]ere 'technical' deviations from the Act or even a number of them are insufficient." *Bearden*, 659 F.2d at 601; *Davis*, 546 F.2d at 589; *United States v. Evans*, 526 F.2d 701, 706 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976). Pererrations from the Plan are judged by no harsher a standard: the court must determine whether the claimed noncompliance has resulted in a serious violation of the Act and, thus, its underlying tenets. *See, e.g., Bearden*, 659 F.2d at 601; *United States v. Rodriguez*, 588 F.2d 1003, 1009 n. 21 (5th Cir.1979); *United States v. Tarnowski*, 429 F.Supp. 783, 788–89 (E.D.Mich.1977), *aff'd*, 583 F.2d 903 (6th Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *United States v. Gurney*, 393 F.Supp. 688, 701 (M.D.Fla.1974). "The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself and its goals have been frustrated." *Bearden*, 659 F.2d at 601.

Given this overview of the caselaw, the court will proceed to analyze seriatim several components of the defendants' nonconstitutional challenge. (Those forays which are not specifically addressed below are so plainly meritless that they need not be dignified by extended discussion.)

### 1. *The Dual Master Wheels*

■ The defendants urge that the practice of maintaining separate master wheels for grand and petit juries is contrary to the Act and Plan. While the Act admittedly appears to speak in terms of a single master wheel for both grand and petit juries, there is absolutely nothing to indicate that the use of only one wheel per district is necessary to accomplish the goals of the Act. Just as the district courts may promulgate local rules of court not incon-

sistent with law, *Aggarwal v. Ponce School of Medicine,* 745 F.2d 723, 726 (1st Cir.1984); *see* Fed.R.Crim.P. 57(a), so too, the district courts should not be needlessly hamstrung in the implementation of the Act as long as its imperatives are fully preserved. *Cf.* Fed.R.Crim.P. 57(b) ("If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with ... applicable statute."). Moreover, Congress clearly stipulated that each local plan shall "specify the procedures to be followed by the clerk or jury commission in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels." 28 U.S.C. § 1863(b)(8). It is entirely reasonable for the district to implement this provision by creating two separate wheels for the grand and petit juries, as long as the selection and maintenance of each wheel conforms to the underlying principles of the Act and Plan.

Even so, Cicilline and Marrapese argue, there is room to doubt whether such an implementing choice has been made. The Plan, as they read it, does not expressly require the maintenance of two master wheels. To be sure, there is some ambiguity. For example, while the applicable section heading reads "Maintaining Master Jury Wheels," the first sentence of that section states that "[t]he Clerk shall maintain a master jury wheel for the District of Rhode Island." Nevertheless, a careful reading of the entire Plan reveals that it speaks in the plural far more often than in the singular. Key examples are found in such sections as: (1) "Selecting the Names by Machine Methods" ("If the court elects to use electronic machine methods in connection with any or all of the district's voter records, source lists, master jury wheels, or qualified jury wheels, the name selection system shall be planned and programmed according to a 'starting number' and 'quotient formula'"); (2) "Maintaining Master Jury Wheels" ("The physical form of record on which names for the master wheel(s) are kept may include such electronic data storage devices as punched cards, magnetic tapes, or magnetic disc

files."); and (3) "Drawing of Names from the Master Jury Wheels; Completion of Juror Qualification Forms" ("The Clerk, either all at one time or at periodic intervals, shall publicly draw at random from the master jury wheels the names of as many persons as may be required to maintain an adequate number of names in the qualified jury wheels."). And, the testimony indicated that dual wheels have been employed since the Plan was adopted. As the clerk/magistrate testified, the system has been in effect for some time; its use was well-known to both the former and present chief judges; and there has never been a murmur of protest. Such longstanding acquiescence is itself probative of intent. *Cf., United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982); *Town of Brookline v. Gorsuch,* 667 F.2d 215, 220 (1st Cir.1981).

■ In the court's view, the Plan has envisioned a multiple master wheel system all along, and continues to contemplate such usage. The defendants have not shown that the existence of dual jury wheels in any way detracted from the randomness of the selection process or the neutral determination of juror qualifications on the basis of objective criteria. Neither the goals of the Act nor the rights of these defendants have been jeopardized by the two-wheel system. The practice comports with the Plan and does no violence to the Act. The defendants' remonstrance is jejune.

### 2. *The Grand Jury Master Wheel*

The defendants further contend that the grand jury master wheel itself violated both the Act and the Plan because it was too small. This argument is wrongheaded, pure and simple. Both the Act and the Plan allow for a jury wheel of 1,000 names. Congress has required that:

The plan shall fix a minimum number of names to be placed initially on the master jury wheel, which shall be at least one-half of 1 per centum of the total number of persons on the lists used as a source

of names for the district or division; but if this number of names is believed to be cumbersome and unnecessary, the Plan may fix a smaller number of names to be placed in the master wheel, but in no event less than one thousand.

28 U.S.C. § 1863(b)(4).

In line with § 1863(b)(4), this district amended its Plan to require that:

[T]he minimum number of names to be placed in the master jury wheel shall be approximately one-half of 1% of the total number of names on all municipal voter lists but never less than 1000 names.

Though use of one-half of 1 percent of the aggregate registered voters would have produced a master wheel with approximately 2650 names, both the Act and the Plan explicitly deem a 1000-name wheel adequate in these precincts. A roster of that size was in fact randomly selected to comprise the initial array. When the formula used is one clearly authorized by the statute, any claim that a violation (either in form or in substance) has taken place is foredoomed. Moreover, this wheel, which was used just to select grand juries, would have been adequate under the Act for the selection of both the grand and petit juries called during the period in question. Viewed in this context, the existence of the two wheel system actually provided a larger pool for the selection of grand jurors than was statutorily mandated, thereby affording greater protection for the defendants' rights.

■ The defendants, however, have based their challenge primarily on a later stage in the selection procedure, arguing that the April 1984 grand jury was actually drawn from a diminished pool of approximately 180 qualified grand jurors. But, neither the Act nor the Plan require that the final selections be made from a cadre of 1000; the chiliadal minimum plainly refers to the randomly chosen master wheel which is the starting point in the qualification process—not to the final qualified wheel. See 28 U.S.C. § 1863(b)(4)–(8). The Plan stipulates that "[t]he Clerk, either all at one time or at periodic intervals, shall

publicly draw at random from the master jury wheels the number of as many persons as may be required to maintain an adequate number of names in the qualified jury wheels." Neither the Act nor the Plan indicate how many names are "adequate"; that matter, wisely, is left to the clerk's discretion so that he can gauge sufficiency from time to time dependent upon the precise circumstances at hand.

In this instance, the clerk/magistrate had received a directive from the Administrative Office of the U.S. Courts, suggesting that qualifications be handled in groups of roughly 500. In pursuance of that recommendation, he mailed 447 randomly selected questionnaires, keeping the remaining 553 names in reserve. The key to the propriety of halving the wheel in this fashion was the randomness of the cut. Then, as a result of the normal operation of the qualification process, a reservoir of 231 potential grand jurors emerged from which to select three grand juries, totalling 69 individuals. The mere recital of the numbers plainly attests to the adequacy of the pool for its intended purpose. And, the underlying principle of stochastic selection was at work throughout.

Once again, the defendants have failed to evince a constitutive violation. Neither the breadth of the master wheel nor the size of the qualified pool undermined the goals of the Act. See United States v. Manbeck, 514 F.Supp. 141, 143–44 (D.S.C.1981) (although grand jury was selected from a qualified pool which was smaller than the 300 names required by the local plan, there was no violation of the Act's purposes). This court has scant hesitancy in finding that the residue of qualified names was sufficient within the meaning and intendment of the Plan. It was, likewise, reasonable and lawful under the Act.

3. *The Qualification Process*

In their final statutory challenge, the defendants hawk the proposition that excusals and exemptions were granted by clerk's office personnel, rather than by a judge, thereby gutting the Plan. This ab-

sence of judicial oversight, they complain, resulted in improper disqualifications and substantially violated not only the Plan, but the Act as well.

▇▇▇ The mere fact that the judges and the clerk/magistrate delegated manual aspects of the qualification process to clerk's office personnel is, if error at all, a fribbling violation of the statute and plan. *See generally United States v. Maskeny,* 609 F.2d at 193; *United States v. Evans,* 526 F.2d at 704–06; *United States v. Layton,* 519 F.Supp. 946, 953–54 (N.D.Cal.1981); *United States v. Huber,* 457 F.Supp. 1221, 1231 (S.D.N.Y.1978). From a practical perspective, however, delegation of these tasks was not only desirable but necessary. Overtaxed judicial officers have other responsibilities which occupy their time; to burden them with the operose chore of manually sorting through hundreds of juror questionnaires would be a prodigal— and ludicrous—waste of judicial resources. *Cf. Huber,* 457 F.Supp. at 1231. So long as judges exercise the general oversight which is, from time to time, reasonably necessary to insure that the jury selection process is fundamentally fair, the day-to-day administration of the minutiae of the work can—indeed, should—be delegated to lay personnel.

Excusals by the staff of the clerk's office would constitute a substantial violation of the Act only if such reprieves were granted under impermissible subjective criteria or in such a way as to taint the randomness of the venire. *Layton,* 519 F.Supp. at 954. In this instance, the defendants have made no showing whatever that the deputy clerks employed anything but objective criteria in sifting through the returns. Though the clerk/magistrate did testify that he might not have excused some of the grand jurors who were disqualified by the deputy clerk, there is no reason to require, in this context, that the judgments of subordinates identically mirror the clerk's. As the defendants, themselves, have expressed it, Magistrate DeCesaris "normally is very conservative when it comes to excusing, disqualifying, or exempting prospective ve-

niremen" as he "tends to keep as many people as possible on the Grand Jury." All that such a pronouncement proves, however, is that different persons, exercising good faith and best efforts, may apply the same criteria somewhat differently. This kind of discrepancy arises frequently when several people are involved in the same job. But, it requires a gargantuan overdose of nullifidianism to elevate that fact of life to the transgression of a defendant's rights. After all, even judges, called upon to exercise discretion in the most weighty matters, rarely exercise it in precisely the same way.

Here, the deputy clerk plainly used the excusal criteria listed in the Plan. Though she may have applied them more leniently than the clerk/magistrate might have done, that fact, standing alone, does not alter the self-evident truth that the excusals were ceded in accordance with the Plan. There has been no reliable showing that any appreciable number of erroneous determinations (inclusions or excusals) occurred. Even if arguably incorrect decisions were made, they were too few in number, too insignificant, too desultory, to constitute a substantial violation of the Act. In fine, the defendants have made no showing that any prejudice resulted from the delegation or from the deputy clerk's tamisage. And, the court's independent examination of the evidence has revealed none such.

Nor is the defendants' case strengthened on this point by their contention that the deputy clerk should have gone further and requested supplemental information from some of the persons who sought to be excused. The failure to perform such follow-up activity is not error. *Cf. United States v. Santos,* 588 F.2d 1300, 1303 (9th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *United States v. Layton,* 519 F.Supp. at 956; *United States v. Marcano,* 508 F.Supp. at 467; *United States v. Armsbury,* 408 F.Supp. 1130, 1141 (D.Ore.1976). If court officials, in ordinary circumstances, could not routinely accept juror questionnaires at face value, the result would be an administra-

tive nightmare. No useful end is served by epurating the criminal justice system to so fine a state that it becomes effectively unworkable. The practicalities of the situation require some reasonable line-drawing; absolute perfection is neither administratively feasible nor legally mandated.

In the last analysis, Marrapese and Cicilline have failed to demonstrate that the basic canons of the Act or Plan were thwarted, perverted, or ignored in assembling the grand jury array. To the extent (if at all) that violations have been shown, those bevues were technical in character and nugacious in nature. They did not, whether viewed discretely or in their ensemble, substantially impact either the fairness of the process or the rights of the defendants. The April, 1984 grand jury venire was chosen in fidelity to the commands of the Congress. Though the selection and qualification process may not have been a textbook model, any deviations which arguably occurred were picayune, unintentional, aleatory, and, given the applicable legal standard, manifestly insufficient to upset the statutory applecart. The defendants' asseverations in this respect amount to little more than the attempted circumcision of fleas; they are uniformly rejected.

### III. THE CONSTITUTIONAL CHALLENGE.

In assailing the composition of the grand jury on constitutional grounds, the defendants claim that the court's excusal procedure in this instance resulted in the systematic exclusion of a readily identifiable segment of the community. They argue that men and women from the so-called "professional" occupations were overexcluded from this grand jury, thus trampling upon the right to a jury drawn from a fair cross-section of the community. In mounting this initiative, the defendants face no timeliness problems, inasmuch as 28 U.S.C. § 1867(e) specifically intones that:

Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries.

The court of appeals for this circuit has recently had occasion to comment upon the hallowed roots of the fair cross-section requirement:

The Supreme Court has grounded the requirement of a jury drawn from a cross-section of the community on the equal protection clause, *Hernandez v. Texas*, 347 U.S. 475, 476–82 [74 S.Ct. 667, 669–673, 98 L.Ed. 866 (1954); *Strauder v. West Virginia*, [10 Otto 303, 307–10], 100 U.S. 303, 307–10 [25 L.Ed. 664] (1879); the supervisory power of the court over the right to jury trials in federal courts, *Ballard v. United States*, 329 U.S. 187, 193 [67 S.Ct. 261, 264, 91 L.Ed. 181] (1946); *Thiel v. Southern Pacific Co.*, 328 U.S. 217 [66 S.Ct. 984, 90 L.Ed. 1181] (1946), and the sixth amendment which binds the states through the Fourteenth amendment, *Taylor v. Louisiana*, 419 U.S. 522 [95 S.Ct. 692, 42 L.Ed.2d 690] (1975).

*Barber v. Ponte*, No. 84–1750, slip op. at 4 (1st Cir. April 5, 1985) (footnotes omitted).

■ Congress has specifically declared the cross-section principle to be federal policy. *See* 28 U.S.C. § 1861. And, the existence of a constitutional violation in this wise does not depend on the circumstances or status of the person making the claim, but on whether the jury has been selected on a constitutionally impermissible basis. *Peters v. Kiff*, 407 U.S. 493, 498, 92 S.Ct. 2163, 2166, 33 L.Ed.2d 83 (1972).

■ In order to establish a prima facie violation of the cross-section requirement, it is incumbent upon the defendants to show: (1) that the group alleged to be excluded is a "cognizable" or "distinctive" group in the community; (2) that the underrepresentation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of

such persons in the community; and (3) that the underrepresentation which permeates a particular petitioner's venire is due to the systematic exclusion of the group in the jury selection process.[2] *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Barber,* slip. op. at 4. The Supreme Court long ago pinpointed the constitutional values which are damaged when a cognizable group is excluded from the jury selection modality, including potential prejudice against the defendant and stigmatization of the group excluded from service. *Strauder v. West Virginia,* 100 Otto 303, 308–09, 100 U.S. 303, 308–09, 25 L.Ed. 664 (1880). Such considerations remain current. "Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well." *Peters v. Kiff,* 407 U.S. at 502–03, 92 S.Ct. at 2168, 2169.

[11] To determine whether a group is "cognizable" or "distinctive," a court must examine factors such as adequacy of definition, degree of cohesiveness, and the potential for prejudice (*i.e.,* whether the exclusion of the group might cause juries to be biased against a defendant from that group or, on the other hand, might foster stigmatization of the group itself). *Barber v. Ponte,* slip op. at 9; *Willis v. Zant,* 720 F.2d 1212, 1216 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *United States v. Test,* 550 F.2d 577, 584 (9th Cir.1976). On all three of these criteria, the defendants' attempted identification of "professionals" as a cognizable group is doomed to certain failure.

■ It is nearly impossible to define (and the defendants have utterly neglected to offer any discernible profile for) "professionals" in our society. Though the court recognizes that the boundaries of any careerist group may, of necessity, be arbitrarily staked out, there must nonetheless be some articulable perimeters. There are none in this instance; the entropy is pervasive. Does "professional" status depend on a college degree? An advanced degree? A license to practice? An inside job? A desk job? The entitlement to an office? Salary? A tie and jacket (or a skirt instead of pants)? While society does make distinctions based on age, *Barber,* slip op. at 10, 13–14, it simply is not in the habit of recognizing or identifying "professionals" as such. And, although the Court has indicated that there may well be economic groups within a community which are cognizable for jury selection purposes, *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), any such group must, at least, be susceptible of rational definition. That is not the case here.

Nor is this asserted group a uniform one. Cohesiveness requires, as its starting point, a meaningful community of interest. And, "professionals" *en masse* simply do not collectively share the attitudinal and experiential distinctiveness which is required to bottom such a finding. Though it may be possible to see lawyers, doctors, or engineers as groups in themselves, there is nothing to indicate that members of these three occupations perceive themselves as joint proprietors of a particular status or interest.

The defendants are not furthered in their quest if the court assumes that the "professionals" of whom they speak are those persons eligible for excusal or deferment from jury service under the Plan by reason of vocation (a potpourri of callings which includes clerics, attorneys, health care providers, veterinarians, pharmacists, funeral directors, teachers, and sole proprietors of businesses). *See* text *ante* at Part I. The movants have presented no expert witnesses or other evidence to link these seemingly disparate groups together in any meaningful way. And, no community of interest is readily apparent. It would require an absurd apotheosis of conjecture over common

---

**2.** It is important to note that the focus is on infection of the *venire,* not necessarily upon any taint in the particular jury which considered the movant's case. *Barber,* slip op. at 22–24.

sense to speculate that, say, a brain surgeon and a kindergarten teacher would, on average, possess a shared (distinctive) attitudinal/experiential perspective; or that, across the board, owner-operators of convenience stores would see themselves as tenants in common of a particular status with, say, ministers and rabbis. Certainly society, in any objective view, recognizes broad discrepancies in interest and status among these diverse vocational groupings. It follows inexorably that the defendants' proposition, once stated and examined, is virtually self-abnegating.

Finally, it is exceedingly difficult to visualize how the absence of this amorphous "professional" class from a venire could create either prejudice to a defendant or stigmatization of the absentees. As a barrister, Cicilline claims membership in the professional class and argues that their absence could prejudice his rights. While the presence of a lawyer could conceivably benefit this defendant, he is surely not entitled to have a lawyer on his jury. *See Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). Moreover, he does not claim a right to have one or more attorneys on the venire, but to have "professionals" (whatever that may mean) on the panel. There is nothing to suggest that a doctor or a pulling guard would have a different perspective on this indictment than a bricklayer (assuming arguendo, if one will, that a mason is not a "professional"). In short, the group alleged to have been excluded is not at all similar to those cognizable groups which have been recognized by the courts. *E.g., Strauder*, 10 Otto at 308, 100 U.S. at 308 (race); *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946) (sex); *Hernandez v. Texas*, 347 U.S. 475, 479–80, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) (ethnicity); *United States v. Benmuhar*, 658 F.2d 14, 19 (1st Cir.1981) (lack of fluency in the English language), *cert. denied sub nom., Nieves v. United States*, 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982). The movants cite to no authority which directly supports their rather extraordinary notion of cognizability, and for good reason: none exists.

The lack of distinctiveness is itself fatal to the constitutional claim. Passing this point for the sake of argument, it is doubtful that these defendants could meet either of the other *Duren* criteria. There has been no evidence that this alleged group was statistically underrepresented on the grand jury venire and no evidence of a disparity between the percentage number of professionals on the jury panel and in society. In fact, the defendants have not even met the requirement of demonstrating "the percentage of the community made up of the group alleged to be underrepresented," *Duren*, 439 U.S. at 364, 99 S.Ct. at 668, which would have allowed the necessary comparisons to be made. Since the group cannot be adequately defined, either intrinsically or for statistical purposes, it cannot be determined whether any significant underrepresentation actually occurred. And the movants, of course, had the devoir of persuasion on this issue. *Barber v. Ponte*, slip op. at 4. They have wholly failed to make out their prima facie case.

Though supererogatory in light of the foregoing, the court cannot help but remark that barely 3½% of the potential grand jurors were excluded for reasons which were even arguably related to professional callings (too unpersuasive a margin of error on which to find a constitutional violation). The court calculates the relevant percentages in the following manner. In consequence of the process, 179 juror questionnaires ended up in the disqualified pile as designating "exempt" or "excused" individuals. Of this batch, nineteen may have been excluded, in whole or in part, on the ground of their professions, viz: six individuals checked Excuse No. 3 (relating to one or more of certain enumerated fields, *e.g.,* health care), and thirteen checked Excuse No. 5 (addressed to teachers). Of the first group of six, one was a nurse's aide, three were nurses, and two were physicians. Two of these offered independent nonvocational grounds for being

released from jury service.[3] Of the thirteen teachers, one was in fact a principal (for whom no substitute was available). Two actually lived out of state; they were thus ineligible for jury service. Accordingly, at most, fourteen people were (leniently) excused solely because of their claimed professional obligations. Since the deputy clerk apparently reviewed 410 questionnaires, it follows that fewer than 4% were excluded on grounds even tangentially related to the defendants' thesis, and that the "professional" excusals amounted to less than 8% of the total excusals.[4]

Perhaps most telling, the defendants offered no evidence to indicate that any alleged underrepresentation was due to *systematic* exclusion from the selection process. As was made clear earlier, *see* text *ante* at Part II, the exclusions complained of were implemented by a deputy clerk interpreting the guidelines somewhat more graciously than the clerk/magistrate might have done. There is nothing to show that any of the questioned grants of amnesty were impermissible under either the Act or the Plan. Congress has clearly indicated that certain groups may be pardoned from jury service, 28 U.S.C. § 1863(b)(5), and the local Plan implements that intent. The bases for these excusals have been established by the Congress, and the defendants have not challenged either the Act or the Plan as creating unconstitutional standards in this vein. This court sees no reason to tamper with the legislative judgment.

■ Neither the Constitution nor the Act requires that juries precisely replicate the communities from which they are drawn. *Taylor v. Louisiana*, 419 U.S. at 538, 95 S.Ct. at 701. "All that the Constitution forbids ... is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been systematically excluded." *Apadaca v. Oregon*, 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972). There was, in the case at bar, neither any (invidious) routinized exclusion of particular segments of society nor any affront to any cognizable class. The defendants having failed to make out even a shadow of a prima facie violation of the cross-section requirement, their constitutional challenge rings hollow.

## IV. THE SITTING GRAND JURY.

■ The defendants complain, too, that excusals from the sitting grand jury were handled by the United States Attorney's office. Their argument in this regard sheds far more heat than light. They seem to contend that this procedure allowed, or could have allowed, the prosecutor to handpick a grand jury that would return an indictment against the defendants at all costs. The malediction is supported by neither the law nor the evidence.

In the first place, it must be understood that the prosecutors did not "excuse" anyone from grand jury attendance. Indeed, the United States Attorney's office does not have the authority to excuse a grand juror from completing his full term of service; that prerogative is, as the government concedes, reserved to the court. *See* Fed.R.Crim.P. 6(g). In the one instance of a grand juror whose term was effectively remitted, the grand juror had notified the

3. One of the nurses also checked Excuse No. 4, requesting deferment because she had care and custody of a child under sixteen. One of the doctors was also over 70 (Excuse No. 1), suffered arteriosclerotic heart disease and peripheral vascular disease, and worked in a solo practice.

4. These calculations are based upon the evidence of record in this proceeding. It has come to the court's attention, in the course of evidentiary hearings on a similar challenge in an unrelated case, that perhaps as many as 80 of the 447 mailed questionnaires were never returned to the clerk's office. If that is true, certain of the computations limned above would change accordingly. But even so, the bottom line would not vary materially: the maximum exclusion ratio would nonetheless remain under 5%. And, the proportion of arguably "professional" excusals to overall excusals (less than 8%) would not be affected.

clerk's office that he had moved out of state. That individual had not been available for grand jury service since August, 1984 and there is nothing to suggest that his absence was procured by the United States Attorney, or that his failure to attend ensuing sessions was irregular or unlawful. (It is uncontested that, at all times material hereto, the grand jury had a quorum for the conduct of its business, and that the requisite minimum number of grand jurors voted to return the instant indictment.) In employing the word "excused" to demarcate those grand jurors who notified the prosecutors that they would not be able to attend a given session, the United States Attorney was in no way dispensing a special grace. Rather, counsel for the government was acting as an internuncio, a conduit through whom the message was transmitted. And, the United States Attorney played the part of an amanuensis, nothing more, in marking as "absent" a juror who, though "unexcused," simply failed to appear.

In keeping score in this fashion, the prosecutors were simply eyeing the tally suggested by the quorum requirements of Fed. R.Crim.P. 6(a) ("The grand jury shall consist of not less than 16 nor more than 23 members."). There is nothing to suggest that, if the obtaining of a quorum had presented an actual problem, counsel for the government would not have approached the court to seek formal excusal and empanellment of replacements under Rule 6(g).

The evidence does not reflect that the United States Attorney absolved any grand jurors from attending, or evaluated the reasons for nonattendance, or that he attempted to pre-select the actual composition of the panel on any occasion. To the contrary, the three persons who were "excused" on the day this case was considered had legitimate reasons for being unavailable. And, there is no hint that these reasons were devised by the prosecution or known by it sufficiently in advance of the fact to permit the Machiavellian type of planning which the defense ascribes to the government. On this pristine record, there is an utter absence of the sort of prosecuto-rial overreaching which might threaten or subvert the sanctity, vitality, or independence of this ancient institution. And, in point of fact, the flexible numerical requirements of Rule 6(a) comport with the very type of score-keeping in which the prosecution indulged.

While the defendants conjecture that a parade of horrors could result from this practice, they do not claim that any actual abuse has occurred—either in this case or in any other. The procedure which the defendants so assiduously attack has been in vogue since time immemorial. It strikes an objective observer as a reasonable way in which to administer the practical mechanics of the grand jury system, having in mind the overall responsibility of the prosecutors for the presentation of evidence (and perforce, for the scheduling of sessions). As the Ninth Circuit has noted, prosecutors, in "the sound exercise of [their] broad discretion ... enjoy great latitude in selecting evidence, witnesses, and methods of presentation for the Grand Jury." *United States v. Al Mudarris,* 695 F.2d 1182, 1188 (9th Cir.), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983). It is in no manner inconsistent with the overriding principles of fundamental fairness. To claim that this procedure diabolized the sitting grand jury requires the aggrandizement of unfounded suspicion at the expense of sweet reason. The defendants' assertions in this regard are entirely without merit.

## V. TERM OF THE GRAND JURY.

The grand jury which returned the present indictment was empanelled on April 27, 1984. The timing was of a piece with preexisting practice in this district, whereby two grand juries are empanelled annually, in April and October of each year, respectively. Though the historical origins of such a pattern are somewhat obscure, it is plainly a throwback to an earlier era when "terms of court," long since abolished, were in vogue (during which period this district divided its annual calendars into two such terms, each of

roughly six months' duration, commencing in or about April and October of each year). This longstanding ritual is mirrored by Local Rule 3(f) of this court, which provides as follows:

(f) *Terms of grand jury.* The grand jury shall be drawn in April and in October to sit as requested by the United States Attorney. The term of each grand jury shall be until such time as the succeeding grand jury is drawn and qualified unless otherwise designated by the United States Attorney or the chief judge of this District.

■ The April, 1984 grand jury was put into service as early as May of 1984; it continued to sit, receive evidence, deliberate, and the like well past October of 1984. One byproduct of that continued service was the return of the instant indictment on February 20, 1985. Another grand jury was empanelled on October 25, 1984. From that time forward, the two grand juries sat in parallel. (Indeed, though it may be of no relevance, the usual protocol in this district is to have three such grand juries on tap at any given moment in time.) It is plain that no formal order was entered by the chief judge of this district extending the life of the April, 1984 grand jury beyond October of 1984. And, it is conceded that no formal attenuation of the grand jury's term was proclaimed by the United States Attorney.

The defendants argue, therefore, that the tenure of the April, 1984 grand jury lapsed upon the empanellment of the October, 1984 grand jury. Thus, their thesis runs, the instant indictment is but a meaningless sheaf of papers, as it is settled that "an indictment returned by a grand jury sitting beyond its legally authorized time is a nullity." *United States v. Fein,* 504 F.2d 1170, 1177 (2d Cir.1974).

At the outset, the court notes that there is a substantial question as to the enduring vitality of D.R.I.L.R. 3(f). It is apparently an anachronistic remnant of bygone days, at loggerheads with modern procedural rules. A brief historical exegisis is enlightening. A half-century ago, a federal grand jury sat only during the term of court for which it was summoned. Act of February 25, 1931, ch. 297, 46 Stat. 1417, 28 U.S.C. § 421 (1931) (now repealed). Under that law, the court could extend a grand jury's season up to a maximum of three terms; during the extended period, however, the grand jury could not begin new projects, but could only delve further into investigations already underway in the course of its initial term. *See United States v. Johnson,* 319 U.S. 503, 511, 63 S.Ct. 1233, 1237, 87 L.Ed. 1546, *reh'g denied,* 320 U.S. 808, 64 S.Ct. 25, 88 L.Ed. 488 (1943). Inasmuch as the terms of court varied from place to place (some districts employed one month terms, others favored three month or six month terms), the lifespan of a fully extended grand jury was as little as three months in some districts and as much as eighteen months elsewhere. Congress, motivated by concerns of nonuniformity and by the fact that some grand juries had to abandon inquiries in midstream due to the shortness of the terms of court in their districts, *see Fein,* 504 F.2d at 1175–76, amended the 1931 Act to allow such panels to serve for up to eighteen months, without regard to terms of court. Act of April 17, 1940, 54 Stat. 110, 28 U.S.C. § 421 (1940) (now repealed).

The landscape was altered by the enactment in 1946 of the Federal Rules of Criminal Procedure, but the eighteen month limit was kept essentially intact. *Id.,* Rule 6(g) ("A grand jury shall serve until discharged by the court, but no grand jury may serve more than eighteen months...."). Regular grand juries, *i.e.,* those not specifically summoned under the authority of 18 U.S.C. §§ 3331 *et seq.,* could be extended beyond the eighteen month benchmark only by act of Congress. *See United States v. Mitchell,* 397 F.Supp. 166, 170 (D.D.C.1974), *aff'd sub nom. United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied sub nom., Erlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The Advisory Committee Note indicated that:

The rule continues the 18 months' maximum for the period of service of a grand jury, but provides for such service as a matter of course, unless the court terminates it at an earlier date.

Terms of court were abolished once and for all by the enactment of 28 U.S.C. § 138 (1963). On February 28, 1966, effective July 1, 1966, Fed.R.Crim.P. 45(c) was rescinded. The Advisory Committee Note described the elimination as "abolish[ing] the expiration of a term of court as a time limitation for the taking of any step in a criminal proceeding ... In view of the fact that the duration of terms of court varies among the several districts and the further fact that the length of time for the taking of any step limited by a term of court depends on the stage within the term when the time begins to run, specific time limitations have been substituted for the taking of any step which previously had to be taken within the term of court."

Despite this chronicle of movement over time, D.R.I.L.R. 3(f) was embodied in the local rules of this district when such rules were first promulgated in codified form, effective September 27, 1971. It remained intact when the Local Rules were revamped (September 1, 1978). (It was still in force in October of 1984 and thereafter.) To flesh out the picture, Fed.R.Crim.P. 6(g) was amended in 1983 to cede power to the district courts to elongate the maximum period of grand jury service for up to an additional six months "upon a determination that such extension is in the public interest." *Id.*

The overarching principle which cements Rule 6(g) into the federal procedural scheme is that the public interest is served by the establishment of a uniform life for federal grand juries nationwide, free from the vagaries and happenstance of the former dependence upon the wavering reed of terms of court. *See United States v. Ar-mored Transport, Inc.*, 629 F.2d 1313, 1316–17 (9th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

The government has offered the court a smorgasbord of theories by which the continuation of the April, 1984 grand jury past October 25, 1984 can purportedly be justified. It argues, inter alia, that D.R.I.L.R. 3(f), if interpreted according to the gloss which the defendants place upon it, is void as being in irreconcilable conflict with Fed.R.Crim.P. 6. And it is true, of course, that the federal procedural rules take precedence over inconsistent local rules. *Miner v. Atlass*, 363 U.S. 641, 650, 80 S.Ct. 1300, 1305, 4 L.Ed.2d 1462 (1960); *Carter v. Clark*, 616 F.2d 228, 230 (5th Cir.1980). *See also* 28 U.S.C. § 2071; Fed.R.Crim.P. 57(a). The government argues, further, that the phrase "succeeding grand jury" contained in Local Rule 3(f) should be construed to refer not to the next grand jury drawn, but to the grand jury chosen eighteen months later, having in mind the district's established practice of putting three grand juries in the field simultaneously.[5] *See* text *ante* at 37. Such a strained interpretation is, the United States contends, the only way in which D.R.I.L.R. 3(f) can be harmonized with Fed.R.Crim.P. 6(g). *Cf. United States v. Armored Transport, Inc.*, 629 F.2d at 1316–17. Third, the government urges that the court, barring any other eventuality, should exercise its powers to avoid injustice by suspending the effect of Local Rule 3(f) nunc pro tunc. The prosecution cites to the court's inherent authority in this respect, *e.g., American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970); *Frankel v. Alan Wood Steel Co.*, 31 F.R.D. 284, 287 (E.D.Pa.1962), to the specific caveats contained elsewhere in the Local Rules, *see* D.R.I.L.R. 2(b), 3(a), 51, and to an earlier

---

5. But, the text of the interim orders routinely presented by the United States Attorney to the chief judge of this court, *see* n. 6 *post*, seems to belie this contention. *See, e.g.,* Motion to Extend April, 1983 Grand Jury (entered Sept. 28, 1983): "Now comes [the] United States Attorney ... and moves for an Order that the Grand Jury for the April, 1983 Term be extended, pursuant to Rule 3(f) ... for an additional period ... *from the time the succeeding grand jury is drawn and qualified in October, 1983, ....*" (emphasis supplied).

holding of this court rejecting efforts to apply a local rule in a manner fundamentally at odds with its true purpose. *United States v. Cicilline,* 571 F.Supp. 359, 363–64 (D.R.I.1983). But, although the first and third of these approaches exhibit some ray of light at the end of the proverbial tunnel, the court can more readily dispose of the challenge frontally.

Assuming (without deciding) that Local Rule 3(f) is a valid exercise of this court's powers, that it is not fatally at variance with Fed.R.Crim.P. 6, that it is to be given the narrow, literalistic meaning which the defendants ascribe to it, and that the court cannot/should not exercise its powers of suspension, Cicilline and Marrapese are nonetheless unable to profit from the resultant scenario.

In common parlance, the verb "designate" means, in its applicable sense, to "signify, indicate, ... declare to be, ... specify, stipulate, ... decide upon, ... appoint, ... choose and set apart...." Webster's *Third New International Dictionary* 612 (1981). And, the accepted legal meanings of the term are cut from the same cloth. *E.g.,* H. Black, *Black's Law Dictionary* 402 (5th ed. 1979) ("To indicate, select, appoint, ... set apart for a purpose, ... mark out and make known; ...."). D.R.I.L.R. 3(f) specifically provides that the term of "each grand jury" may be "otherwise designated" by, inter alia, the United States Attorney. *Id.* The rule impresses no particular formalities upon the manner in which this power may be exercised, that is, the form of the designation is left entirely open. At bottom, the local rule confers the power of designation upon the prosecutor, but does not purport to delimit or proscribe in any way the method by which the power must be executed.

Though there are no cases directly in point, common sense teaches that, inasmuch as the source from whence the power emanates (in this case, the district judges who have collectively promulgated the local rule and continued it in effect, and the circuit judges who ratified its adoption) has not seen fit to stipulate how the gears of the authorization may be engaged, the mode of execution is to be at the discretion of him in whom the power is vested (that is, the United States Attorney), so long as the means employed are suitable and the intent to exercise the prerogative is made manifest.

Such logic closely parallels the accepted treatment of powers of appointment in the law of property, estates, and trusts. In those areas, it has long been settled that, "[i]n exercising a power of appointment, the donee is confined to the mode of execution provided for or designated in the power." 62 Am.Jur.2d, *Powers,* § 39, at 136 (footnote omitted). But, "[w]here there are several modes of executing a power and the donor does not direct *how* the power shall be executed, the donee himself may select the mode." *Id.* at 137 (footnote omitted) (emphasis supplied). In such circumstances, the power may be executed in any sufficient manner, so long as the donee's intention to execute it is clear. *Id.* See *Blake v. Hawkins,* 98 U.S. (8 Otto) 315, 326–27, 25 L.Ed. 139 (1878); *Stewart v. United States,* 512 F.2d 269, 274–75 (5th Cir.1975); *Estate of Gartland v. Commissioner of Internal Revenue,* 293 F.2d 575, 580 (7th Cir.1961), *cert. denied,* 368 U.S. 954, 82 S.Ct. 397, 7 L.Ed.2d 387 (1962); *O'Hara v. O'Hara,* 185 Md. 321, 44 A.2d 813, 815 (1945). *Cf. Estate of McNeill,* 463 A.2d 782, 784 (Me.1983). As Chief Judge Murrah has written:

> [Q]uite apart from statutory aids or presumptions the object of our inquiry is the ascertainment and effectuation of the intention of the donee of the power. And if his intent to exercise the power according to its terms and conditions clearly appears upon the face of the ... instrument, ... it will be deemed ... to have executed the power ...

*Ruby v. Bishop,* 207 F.2d 84, 88 (10th Cir. 1953).

It is also well established that:

> The authorities uniformly affirm the doctrine that it is not essential to refer in express terms to the power, if an intention to execute it otherwise plainly ap-

pears; and any words or expressions indicating an intention to exercise the power will operate to that effect.

*Bullerdick v. Wright,* 148 Ind. 477, 47 N.E. 931, 932–33 (1897). *Cf. Cotting v. DeSartiges,* 17 R.I. 668, 673, 24 A. 530 (1892) ("[T]he rule [is] that, to support an execution of a power, something must appear to show an intent to execute it, ....").

And, the law is equally clear that the extrinsic circumstances should—indeed, must—be considered so that the actor's true intent may be ascertained. *E.g., Crane v. Morris,* 31 U.S. (6 Peters) 598, 618–19, 8 L.Ed. 514 (1832) (Story, J.); *Stewart,* 512 F.2d at 275 ("Intent is a subjective state of mind which must be ascertained from all the facts and circumstances."); *Moore v. Barnard,* 75 Colo. 395, 226 P. 134 (1924). *See generally,* Annot., 16 A.L.R.3d 951, 962 (1967) (collecting cases).

It is true that, in respect to prolongation of the life of the April, 1984 grand jury, the United States Attorney made no contemporaneous formal declaration of extension. But, on the very day that the "succeeding" grand jury was seated (October 25, 1984), the prosecutor sent a written notice to all members of the April, 1984 panel convening that grand jury for further duty on November 7–8, 1984. Simultaneously, he notified the clerk of court and the United States Marshal for this district that the April, 1984 grand jury would be in session on those dates. And, the panel was thereafter convened by the United States Attorney for purposes of receiving evidence and/or deliberating on proposed indictments on no less than ten subsequent occasions, culminating in the February 20, 1985 convocation which spawned the true bill in this case.

These actions on the part of the government's counsel exhibited a clear and unmistakable intent to appoint tenure for the April, 1984 grand jury well past the enrollment of its October, 1984 counterpart. To be sure, the means chosen by the United States Attorney to manifest this determination were informal—but nothing in Local Rule 3(f)'s bestowal of the power called for any more elaborate ceremony. The right to attentuate, up to the 18 month maximum service period, *see* Fed.R.Crim.P. 6(g), was an unfettered usufruct of the prosecutor's office. And, the surrounding circumstances leave little room to doubt but that the prosecutor intended to exercise his prerogative. His actions sufficed so to do: his course was adequately charted; his signification was plain; his intent to have the April, 1984 grand jury continue in existence was sufficiently marked out and made known. In short, the term of the April, 1984 grand jury was "otherwise designated" by the United States Attorney to extend beyond the time when the October, 1984 grand jury was drawn and qualified.[6]

Any other result would simply fly in the face of reason. After all, "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). The defendants seek, in essence, to have the court strain at a gnat (disregarding the designation process because of the supposed lack of meticulousness) in order to swallow a camel (deep-sixing half a year's efforts by a duly empanelled and constituted grand jury which had, to the date of this challenge, served less than two-thirds of the 18 month term routinely allotted by the Congress). This Court has no appetite for such a carminative diet. The D.R.I.L.R.

---

**6.** The defendants make much of the fact that, historically, the customary practice in this district has been to confirm extensions of grand jury terms at six month intervals by the preparation and filing of a formal motion addressed to the chief judge, who thereupon enters an ex parte order to the desired effect. The order is then docketed in a miscellaneous file in the clerk's office. Such punctilious practice is clearly to be preferred; had such a protocol been followed in this instance, the instant problem would never have seen the light of day. But, so long as the source of the power—Local Rule 3(f)—does not condition its execution on the use of the particular procedure, the fact that it was employed in the past did not serve either to render it exclusive or to rule out the utilization of less formulary alternatives (such as were employed in this instance).

3(f) menu which has been prepared and served up by the defense is legally indigestible. The grand jury which indicted Cicilline and Marrapese was within its lawful term and duly empowered to act on February 20, 1985. The indictment returned by that body is entitled to full faith and credit.

## VI. CONCLUSION.

Each and all of the protests raised by the instant motions are meritless. The defendants have not shown that the grand jury selection process was unsatisfactory; or that the composition of the panel was fatally flawed; or that excuses and absences from sessions of the sitting grand jury were unfairly manipulated; or that the grand jury's terms had expired when the indictment was returned. Though they have created an Homeric smokescreen, there is no fire. Accordingly, these motions must be, and they hereby are, DENIED.

*It is so ordered.*