[NOT FOR PUBLICATION]

United States Court of Appeals
For the First Circuit


No. 95-2031

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT M. JOOST,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge] 



Before

Lynch, Circuit Judge, 
Coffin, Senior Circuit Judge, 
and Cummings,* Circuit Judge. 



Robert Joost on brief pro se. 
Kenneth P. Madden, Assistant United States Attorney, and Sheldon 
Whitehouse, United States Attorney, on brief for appellee. 



August 7, 1996


 

*Of the Seventh Circuit, sitting by designation.

COFFIN, Senior Circuit Judge. Defendant Robert Joost was 

convicted by a jury of conspiracy to obstruct, delay and affect

commerce by robbery of gold from an armored car, in violation of

18 U.S.C. 1951 (the Hobbs Act).1 He filed this appeal pro se, 

alleging a host of errors. Finding none of them to affect the

integrity of the conviction, we affirm.2

FACTUAL BACKGROUND FACTUAL BACKGROUND

In March 1994, an informant, Tracy, introduced defendant to

two undercover Rhode Island detectives, DelPrete and O'Donnell,

who were investigating the manufacture of counterfeit Foxwoods

Casino (Connecticut) slot machine tokens by defendant and others.

During the ensuing months, defendant supplied the detectives with

many such tokens, which the detectives said they were able to

exchange for cash at the cashier's cage through a cousin of one

of them.

On April 24, 1994, defendant asked the detectives to join

him in robbing a Meehan armored car that regularly carried gold

to New York. He said he had earlier assembled a gang for this

job and had made plans that he now sought to reactivate. In

 

1 The same jury was unable to reach a verdict on a co-
defendant, Grelle, who later pled guilty.

2 Defendant also was charged with two additional offenses.
His conviction for being a felon in possession of a firearm, in
violation of 18 U.S.C. 922(g), is being vacated in a decision
issued simultaneously with this one because of the trial court's
erroneous refusal to give an instruction on entrapment. United 
States v. Joost, No. 95-2032 (1st Cir. July xx, 1996). An 
indictment alleging interstate theft and counterfeiting, in
violation of 18 U.S.C. 371 and 487, was dismissed without
prejudice.

-2-

subsequent conversations in May defendant said that the company

had changed its vehicle from a truck to a van. On May 28,

defendant, Grelle, and the two detectives drove to Pennsylvania

to carry out a robbery of a warehouse or tractor/trailer, but

were intercepted by a prearranged investigative stop in which

police confiscated burglar tools supplied by defendant.

Further talk about the Meehan job led to a surveillance in

woods near the armored car facility on the night of June 29-30.

Defendant had said that the vehicle carried up to $6 million in

gold, and that Leach & Garner was one customer. He said that

guards would arrive at about 3:00 a.m., that one would leave

first for the vehicle and another would follow. Defendant's plan

had two of his team rushing the first guard while a third would

alert them to the approach of the second guard, both of whom

would be seized, and shot if necessary with a silencer. The

robbery aborted when the guards failed to appear.

Executives of both Leach & Garner and Meehan corroborated

the pick-up time (between 4:30 and 5:30 p.m.), the value of the

shipment (averaging $5 million), overnight storage at Meehan's

Woonsocket facility, the arrival of two guards at 3:00 a.m., and

the change in April 1994 from a truck to a van. Defendant

testified that he had gotten his information from a prison

roommate, used them in a novel he was writing, and brought up the

armored car project in order to sustain the interest of the

detectives until he, defendant, could meet and establish his own

-3-

connection with the "cousin" in the casino's cashier's cage. He

had never intended to follow through on an actual robbery.

Insofar as additional facts may be relevant on particular

issues, they will be incorporated into the following discussion.

DISCUSSION DISCUSSION

Defendant represented himself at trial during presentation

of the government's case; after the government rested, he

requested standby counsel to take over. In this appeal, he

resumes self-representation, and has briefed sixteen issues.

While some merit more discussion than others, we shall follow the

sequence in which both defendant and the government have

presented their positions. 

1. "Other Acts" Cross Examination. 

Defendant's basic theme, introduced in his opening and

reiterated in his testimony, was that he did not engage in armed

robberies, that he was fully aware of the heavy penalty imposed

on a convicted felon found in possession of a firearm, and that

his many discussions with the detectives concerning past and

future criminal projects were fanciful tales designed to sustain

their interest until he could establish his own modus operandi

with the casino's cashier.

The government sought to rebut defendant's claim of lack of

intent to rob by asking O'Donnell about the conversations

defendant had had with the detectives concerning various criminal

ventures. On objection, the court refused to allow such

questioning, deeming prejudice to outweigh relevance at that

-4-

point, but noting that the ruling was "subject to whatever else

is going to come out." Defendant subsequently took the stand and

testified at length about his lack of intent to rob the armored

car. 

When the government proposed to cross examine defendant

about his various proposals to the detectives, the court deferred

ruling and further questioning pending resolution of the question

whether, if defendant invoked the Fifth Amendment, all of his

testimony should be stricken. The court subsequently became

satisfied that defendant's taking the Fifth Amendment on

collateral matters would not affect his prior testimony. It

therefore allowed the government to ask some twenty-three

questions about defendant's conversations or actions concerning

proposed thefts from a UPS van, an American Legion hall, and a

Pennsylvania warehouse, and delivery of a firearm to the

detectives. Defendant, in the presence of the jury, invoked the

Fifth Amendment as to each question.3

He now makes two arguments. First, he asserts that the

court improperly failed to balance prejudice against relevance,

although he undercuts this argument by observing, "At best, this

`evidence' was merely cumulative." We think it clear that the

court was fully aware of its responsibilities. It earlier had

 

3 In defendant's subsequent prosecution for being a felon-
in-possession of a firearm, see supra at n.2, his defense of 
entrapment relied on a full disclosure of all of these
conversations and actions, which he characterized as fanciful
fiction, devised to induce the detectives to continue their
dollars-for-tokens support.

-5-

rejected the proffered line of questioning and permitted it only

after defendant testified extensively about his lack of intent.

While, as always, explicit findings would have avoided any issue,

we do not deem this an abuse of discretion. See United States v. 

De La Cruz, 902 F.2d 121, 123 (1st Cir. 1990). 

Defendant's second argument is that there was no "real

evidence" or responses from him backing up the insinuations of

the prosecutor. But this is not a situation where the prosecutor

was flying blind and asking questions without any legitimate

reason. Some of the subject matter -- the trip to Pennsylvania

to rob the warehouse -- was already in evidence; and both sides

were fully aware that most of the relevant conversations had been

taped. The government's attempt to elicit the same information

from its witness had been foreclosed. Defendant, who had the

option of convincing the jury of his "version of the facts and

his reliability as a witness, [or] not to testify at all [,] . .

. cannot reasonably claim that the Fifth Amendment gives him not

only this choice but, if he elects to testify, an immunity from

cross-examination on the matters he has himself put in dispute."

Brown v. United States, 356 U.S. 148, 155-56 (1958). 

Moreover, this objection was not effectively raised at

trial. Only two of the twenty-three questions were objected to on

the ground of "lack of evidence." Both of these concerned

whether defendant had looked at the American Legion building, but

other questions had been asked without objection concerning the

plan to rob that building. 

-6-

2. Rulings admitting evidence. 

a. O'Donnell testified about a conversation with

codefendant Grelle, in which Grelle told of his son's involvement

in an armored car robbery. The testimony was promptly struck and

a cautionary instruction given. After a recess both Grelle and

defendant moved for a mistrial. The linkage between Grelle's son

and defendant is tenuous and remote. This is not mistrial

material.

b. The informant Tracy at one point testified that one

reason why he did not tell defendant that O'Donnell and DelPrete

were really state troopers was concern for his own safety. An

objection was overruled. But earlier Tracy had given the same

reply in direct examination by defendant. Moreover, this adds

nothing to defendant's own talk about being prepared to shoot the

armored car guards. If error, it was harmless.

c. The government asked defendant if he had been

convicted of a conspiracy to violate civil rights by murder.

Objection to the question was overruled. Defendant answered by

saying, "That's not true. It was by death resulting." Then,

after defendant repeated that the conviction was for "conspiracy

to violate the civil rights of a citizen, death resulting," the

prosecutor interjected, "By killing; conspiracy by killing?"

Defendant answered, "Well, yes. There was a death resulting,"

just before objection was made and overruled.

A reading of United States v. Guillette, 547 F.2d 743, 748- 

49 (2d Cir. 1976), reveals that a prospective witness in a

-7-

prosecution against this defendant and another had been killed by

a bomb activated when opening the front door of his house.

Defendant argued that it had been installed by the victim as a

booby trap aimed at him and his codefendant, who were searching

for him to prevent him from testifying. The Connecticut trial

court refused to charge that such a fact, if found true, would

exonerate defendant. The Second Circuit agreed, holding that the

defendants "would still be considered in the chain of legal

causation if the immediate cause of death -- setting a bomb as a

booby trap -- was a foreseeable protective reaction to their

criminal efforts to locate and dissuade him from testifying."

The court, in discussing another issue, even referred to "the

murder of LaPolla [the victim]." Id. at 755. The questions asked 

did not mischaracterize the conviction in any significant way.

Defendant presents four other issues of this nature but

either the objections were sustained or no objection was made;

all are insubstantial.

3. Limiting examination and refusing offer of proof. 

From two days of his cross-examination of O'Donnell,

spanning 174 pages of transcript, defendant distills two asserted

errors. One rises out of a specific limitation on further cross

by the court that prevented defendant from inquiring into

O'Donnell's misreading of a telephone number -- to show that he

might also have misread a gesture defendant had made. This is

obviously within the discretion of the court. 

-8-

The second was merely a final limitation of one more hour

(instead of two), and subsequent 20 and 5 minute warnings. When

defendant wished to make an "offer of proof" of the remaining

questioning he wished to do (which would have centered on missing

or defective tapes), the court refused. We cannot contemplate

how such actions, after two days of cross examining one witness,

could be held an abuse of discretion.

A final asserted error was the ruling preventing defendant

from telling about another armored truck fantasy he had told the

detectives, to prove he was just a storyteller. There already

were quite enough of these to allow defendant to argue his

version.

4. Directing court reporter to read her notes of tape. 

After the jury reported to the court that a tape recording

was inaudible, the court told the jury to make another effort.

Then, following a subsequent request from the jury, the court

ordered the court reporter to read her notes made earlier from

the recording. After she concluded, counsel for defendant

objected, saying that he had been comparing what was being read

with the transcript of the tape, and found some

misidentifications. He mentioned that at one point the reporter

attributed some of the detectives' statements to one or both

defendants.

It is of course the case that the tapes, not the transcript,

constitute evidence. United States v. Richman, 600 F.2d 286, 295 

(1st Cir. 1979). But it is within a judge's discretion to allow

-9-

a reporter to read back testimony, United States v. Akitoye, 923 

F.2d 221, 226 (1st Cir. 1991), and such principle would seem to

apply here. In any event, we see no possibility of prejudice.

O'Donnell had testified extensively about the events and

conversations on the evening of June 29-30, the subject of the

tape recording. Defendant has pointed to no discrepancy in the

courtreporter's reading of her notes that could have damaged him.

5. Dismissal of two jurors. 

During the trial, on April 7, 1995, defendant's counsel

became ill. When it was apparent that the trial would be

suspended for an additional week, the court was informed that two

jurors had prepaid for vacations that were scheduled to begin the

week when trial would resume. The court announced to counsel for

all parties in a telephone conference call that the jurors would

be excused. There was no objection. Defendant claims not to

have known of this action until shortly before trial resumed.

Defendant first argues that a scheduled vacation is not a

legitimate reason to excuse a juror, under Fed. R. Crim. P. 24.

Under the circumstances, this was within the sound discretion of

the court, United States v. Corsino, 812 F.2d 26,33 (1st Cir. 

1987), and in any event this issue was not presented to the

court.

A second argument is that defendant himself was not involved

in the telephone conference. While a party must be represented

by counsel in such conferences, there is no constitutional right

-10-

to be present when dismissal of a juror is discussed. See United 

States v. Brown, 571 F.2d 980, 986-87 (6th Cir. 1978). There was 

no error in dismissing these jurors.

6. Composition of grand and petit juries. 

Defendant moved to dismiss the indictments in this and the

felon-in-possession case for failure to comply with the Jury

Selection and Service Act of 1968, 28 U.S.C. 1861-1878 (the

Act), and the Fifth and Sixth Amendments, and to stay proceedings

until valid petit juries could be drawn. After hearing argument,

the court refused to hold an evidentiary hearing and denied the

motion. Defendant raises four issues.

a. Delay. Defendant claims that delay in making 

available to him jury information denied him due process and

equal protection. Although the Magistrate Judge granted

defendant access to the master jury wheel and the qualified jury

wheel in October, 1994, this did not result in any action until

February 17, 1995, when the court, after a conference requested

by defendant, ordered both wheels to be delivered to defendant.

At a hearing on February 28, defendant, who had already

received the district's jury plan and the two wheels, sought

juror questionnaires and computer programs used to achieve a

random pick. The court granted access to defendant's counsel to

examine the questionnaires. Defendant sought thirty additional

days in which to prepare his motion to dismiss; the court granted

twenty-three days. No request for additional time was made and

no showing was made of additional information needed. 

-11-

The court ruled that defendant had sufficient time to

examine the material, noting that further analysis was unlikely

to lead to new information. We think this judgment well within

the court's discretion.

b. Limiting access to materials. At a pretrial 

conference on March 22, 1995, defendant sought computer programs

used to select the master and qualified jury wheels, names,

addresses, and telephone numbers of computer operators and

programmers, documents used to process juror questionnaires, a

copy of the petit and grand jury venires, and the names and

townships of the grand jurors who returned the two indictments.

The court, after noting that production of records used by the

clerk in the jury selection process is limited to what is

necessary to prepare a motion asserting a substantial failure to

comply with the Jury Selection and Service Act, see 28 U.S.C.  

1867(d), denied the request, holding that defendant had not

submitted a sufficient basis for production of these additional

materials. 

Defendant argues on appeal that his figures had revealed a

flaw in the randomness of Yale's computer program, which was used

to develop the master and qualified wheels. As an example, he

points out that Providence citizens comprised 13.46 percent of

the names on the master wheel but only 8.59 percent of the

qualified wheel. He contends that this discrepancy demanded

further inspection, particularly in light of past glitches in

Yale's computer programming that resulted in the complete

-12-

exclusion of persons from the large communities of Hartford and

New Britain from the qualified wheel and master wheel,

respectively. See United States v. Jackman, 46 F.3d 1240 (2d 

Cir. 1995); United States v. Osorio, 801 F. Supp. 966 (D. Conn. 

1992).

Such a showing falls far short of demonstrating a likely

substantial noncompliance with the Act. Unlike the situations

described in Jackman and Osorio, substantial numbers of 

Providence citizens were on both lists. In light of the

considerable information already made available to defendant and

the extensive memorandum and exhibits that he filed with his

motion to dismiss, the defendant bears a considerable burden of

justifying what would amount to both a considerable intrusion on

people's work and time and substantial further delay of the

trials. The court did not abuse its discretion in refusing

further inspection. See United States v. Davenport, 824 F.2d 

1511, 1514-15 (7th Cir. 1987).

c. Evidentiary hearing. Defendant charges the court 

with error in denying him an evidentiary hearing on his motion to

dismiss the indictments. Under 28 U.S.C. 1867(d), if a movant

submits a sworn statement asserting facts which, if true, would

impeach the jury selection process, he may present testimony of

the clerk or jury commission. The district court, in denying an

evidentiary hearing, referred at one point to the lack of an oath

before a notary public. But defendant had signed his statement

-13-

"under penalty of perjury," which is sufficient under 28 U.S.C. 

1746.4

The court, however, also noted this circuit's strict

adherence to "the gatekeeper prerequisites" of 1867(d). See 

United States v. Foxworth, 599 F.2d 1, 3 (1st Cir. 1979); United 

States v. Marrapese, 610 F. Supp. 991, 996 (D. R.I. 1985). It 

went on to hold that the "purported affidavit is nothing more

than a generalized recitation of self-serving conclusions,

speculation and conjecture."

Our reading of the affidavit confirms this conclusion; its

most salient statements assert discrimination against non-whites,

poor, and certain minorities, and that the master and qualified

wheels were skewed to underrepresent such classes. But defendant

argues that his affidavit refers to "data he has supplied in the

attached Motion to Dismiss" and that the motion to dismiss refers

to "the accompanying Memorandum of Law." The memorandum, signed

by defendant, consists of seventeen pages and derives the facts

it relies on from an appendix of sixteen pages of tables and nine

pages of graphs. The tables, with no indication of source, break

down the population of the various towns and cities into various

categories: income, non-white, occupation, education, language,

ancestry. Pages of data from the 1990 census extend these

 

4 28 U.S.C. 1746 reads in relevant part, "Wherever . . .
any matter is required . . . to be supported . . . by the sworn .
. . statement, . . . such matter may, with like force and effect,
be supported . . . by the unsworn statement, in writing of such
person which is subscribed by him, as true under penalty of
perjury . . . ."

-14-

classifications to include employed females, households receiving

public assistance, and persons over 65 possessing no vehicle.

The entire package is so unfocused, so often irrelevant, and

so seldom tied to verifiable sources that to declare that it

should be considered as integrated with and incorporated into the

affidavit, the only document that vouches for truth, would

undercut the whole purpose of the requirement of 1867(d): to

enable a court to review a challenge to jury composition and

"swiftly dispose of it if it fails." Marrapese, 610 F. Supp. at 

996 (quoting legislative history). See also Foxworth, 599 F.2d 

at 3. 

We therefore do not fault the court for its ruling. But we

also note that defendant was not, in all likelihood, prejudiced

by the ruling. The court heard a fairly detailed summary of

expected testimony from the clerk and an extensive offer of proof

of defendant's expert, a candidate for a Ph.D. degree in

statistics and applied mathematics. In addition, it had read all

of the motion papers, the memorandum, and the appendix. 

d. Fair cross-section. Defendant's substantive claim is 

that non-whites and lower economic classes have been

systematically excluded from the jury selection process in

violation of the Sixth Amendment. Defendant contends that this

underrepresentation results inherently from reliance on voter

registration lists, magnified further by program error or

malfeasance. In support of his theory, he cites data specific to

Providence, which has a non-white population of nearly 30

-15-

percent: the city contains 15.72 percent of the state's

population of 18 and over, yet accounts for only 14.25 percent of

registered voters, 13.46 percent of citizens included in the

master wheel, and 8.59 percent of those in the qualified wheel.

In order to make out a prima facie violation of the fair

cross-section requirement of the Sixth Amendment, the defendant

must show (1) that the group allegedly underrepresented is a

distinctive group in the community, (2) that its representation

in the venires from which juries are chosen is not fair and

reasonable in relation to the total number of such persons in the

community, and (3) that such underrepresentation stems from

systematic exclusion of the group from the jury selection

process. Duren v. Missouri, 439 U.S. 357, 364 (1979). 

The district court assumed that the first requirement --

distinctiveness -- was met as to non-whites and low income

persons. We also assume the point. In moving on to the issue of

fair and reasonable representation, we must reject defendant's

first proposition cited above. An assault on voter registration

lists must be based on something more than the general

observation that non-whites and low income people may tend to

register to vote much less than more affluent or white people do.

Davenport, 824 F.2d at 1514-15. Nor do "numerical disparities 

resulting from the use of voter-registration lists . . . violate

a defendant's Sixth Amendment rights." United States v. Ireland, 

62 F.3d 227, 231 (8th Cir. 1995).

-16-

When we further consider defendant's statistical

presentation, we recognize a significant problem: rather than

count non-whites and low income people on the voter registration

lists, and the master and qualified jury wheels, defendant uses

Providence as a surrogate for both groups. Defendant's premise

is somewhat appealing, but we are not convinced that such an

approach is permissible. Non-whites and low income people may

very well be fairly represented in both wheels whether or not

Providence is. And we have the further doubt created by the

absence of information concerning the proportion of Providence's

non-white (or for that matter its low income) population which

has registered to vote.

But if we overlook these questions, we still face the facts,

as did the district court, that the absolute disparity between

Providence's representation in the voter registration list and

that in the master jury wheel is .79% (14.25% - 13.46%); and that

the absolute disparity in its representation in the master jury

wheel and in the qualified jury wheel is 4.87% (13.46% - 8.59%).

Even the broadest potential comparison, between Providence's

representation in the state's population of 18 and over and its

representation in the qualified jury wheel, yields an absolute

disparity of only 7.13% (15.72% - 8.59%). As we recognized in

Hafen, 726 F.2d at 23, absolute disparities of up to ten percent 

are widely conceded not to constitute underrepresentation.5 See 
 

5 Absolute disparity measures the difference between the
percentage of a distinctive group in a certain population and the
percentage of that group in a subset of that population. In the

-17-

also Ramseur v. Beyer, 983 F.2d 1215, 1232 (3d Cir. 1992) (14.1% 

"borderline"); United States v. McAnderson, 914 F.2d 934, 941 

(7th Cir. 1990) (8% is de minimis); United States v. Pepe, 747 

F.2d 632, 649 (11th Cir. 1984) (7.6% "well within . . . limits");

United States v. Butler, 611 F.2d 1066, 1069-70 (5th Cir. 1980) 

(under 10% permissible).

We see no reason to depart from this standard. We think it

strikes a correct balance between avoiding egregious

discrimination and becoming enmeshed with statistical approaches

aimed at unrealistic fine tuning.

As for Duren's third prong, the requirement that systematic 

exclusion be shown, we have already ruled out reliance

simpliciter on voter registration lists. What would have to be 

demonstrated would be either "the use of suspect voter-

registration qualifications or discriminatory administration of

the jury-selection procedure." Ireland, 62 F.3d at 232. But 

voter qualification has never been in issue and the only showing

concerning creation of the qualified wheel from the master wheel

is defendant's offer of proof that a court officer would testify

that persons were selected at random. Defendant also raises the

possibility of abuse because names are drawn for new venires from

 

jury selection context, this figure is generally achieved by
subtracting the percentage of a group on the jury wheel from the
percentage of that group in the community. Joost has suggested
alternative methods, but the absolute disparity test is
appropriate where, as here, the allegedly underrepresented group
constitutes a very small proportion of the total population. See 
United States v. Pion, 25 F.3d 18, 23 (1st Cir. 1994); United 
States v. Hafen, 726 F.2d 21, 23-24 (1st Cir. 1984). 

-18-

a stable qualified list, and someone, sometime, could make

improper use of such a list. This is too remote to be

substantial.

In short, the challenges to the juries were properly

dismissed. 

7. Propriety of Instructions. 

Defendant lodges seven claims of error in instructing the

jury. Only three merit specific treatment.

a. The first contention, that the court refused to give

an instruction on the intent necessary to violate the Hobbs Act,

is somewhat mystifying. Defendant states in his reply brief that

both an intent to agree and an intent to execute the agreement

are necessary. But he acknowledged that he was writing without

access to the record. In fact, the precise instruction he seeks

was given by the court.

b. Defendant charges error in the court's instruction

that the jury could consider his invocation of the privilege

against self incrimination in evaluating his testimony. A court

may instruct a jury to go further than the court did in this

case, i.e., that the jury could draw an adverse inference. See 

Caminetti v. United States, 242 U.S. 470, 494 (1917); United 

States v. Kaplan, 832 F.2d 676, 684 (1st Cir. 1987). Defendant 

has confused a situation where, as here, a person (whether a

party or a non-party witness) invokes the Fifth Amendment on a

matter relevant to the issues before the court and the situation

where a person invokes the privilege when asked about a matter

-19-

wholly beyond the scope of the issue at hand, as in United States 

v. Nunez, 668 F.2d 1116, 1122-23 (10th Cir. 1982). 

c. The court charged that factual impossibility, which

occurs "when extraneous circumstances unknown to the Defendant .

. . prevent the consummation of the intended crime," is not a

defense. Defendant claims that this was not applicable because

he knew at the time that the armored car was not stored in

Woonsocket. But the jury need not have believed him.

d. The other challenges to instructions are even less

weighty. As to two, there was no objection raised after the

instructions. As for the court referring to Tracy as both an

informant and an accomplice, the status of informant alone

justified the charge. And the charge as a whole left no doubt as

to the law that defendant was accused of violating.

-20-

8. Violation of Rule 30. 

Fed. R. Crim. P. 30 requires that opportunity be given a

party to object to an instruction out of the hearing and presence

of the jury. As noted above, the jury twice requested that the

court reporter read the notes that she made from the June 29 tape

recording. On the first occasion, the court told the jury first

to listen to the tape and that, if necessary, the reporter could

later read her notes. When asked if he had any "problem" with

that, counsel for defendant stated that the tape, not what the

reporter heard, was the evidence. When the jury made its second

request for the reporter's notes, the court asked counsel if he

wished to say anything. Counsel stated that he had the same

objection. When the jury retired, counsel moved unsuccessfully

for a mistrial on the ground that Rule 30 had been violated.

The government argues that Rule 30 is not applicable, since

the court was not giving any instructions on the law, but merely

making a trial ruling such as requiring a witness to answer a

question. We agree. The entire focus of the rule is on the

instructions on the law given by a judge at the close of the

trial. The objection addressed by the rule is one made to "any

portion of the charge or omission therefrom." The incident at

issue here was not within the compass of Rule 30. 

9. Playing excerpts of tapes. 

Many tape recordings were made of defendant's conversations

with the detectives. Excerpted portions of eight of these were

allowed to be played to the jury. Defendant objected to the

-21-

playing of each tape, usually on three grounds: authenticity,

defective chain of custody, and lack of completeness. He did not

elaborate on his objections, nor did he suggest additional

portions that should be played. He now asserts that he wanted

the jury to hear how the conversations led up to the excerpted

portions, so that the jury would see that discussions of

particular robberies were just part of "a larger plethora of

stories Joost was telling the agents and that he was the 

consummate prevaricator."

Fed. R. Evid. 106 allows a party to supplement part of a

recorded statement when the additional portion "ought in fairness

to be considered contemporaneously with it." The trial court must

have discretion to conduct what "essentially[] becomes a line-

drawing exercise, to be conducted case by case." United States 

v. Boylan, 898 F.2d 230, 256 (1st Cir. 1990). When confronted by 

flat opposition to playing any excerpts of eight time consuming

tapes, the court can hardly be faulted for not attempting more

sensitive editing.

10. Refusal to recuse sua sponte. 

Although defendant made no motion for the judge's recusal,

he contends that 28 U.S.C. 455 required the judge to recuse

herself sua sponte based on an ex parte conference with him. The

underlying circumstances involved the judge's role, before her

appointment to the bench, as Disciplinary Counsel for the Rhode

Island Supreme Court. During the judge's time in that position,

one Freda Salisbury filed a complaint against an attorney.

-22-

Defendant informed the court at the conference that Salisbury was

his mother. According to defendant, Salisbury had harsh words

with someone in the Disciplinary Counsel's office. The complaint

was dismissed and defendant spoke to someone unknown to him in

that office, making strong criticisms of both the Disciplinary

Counsel and the process. 

This case was first assigned to another judge. Defendant

goes beyond the record to assert that the judge who heard the

case "had this case reassigned to herself . . . in order to seek

retribution against [defendant] for accusations he had made

against her . . . ." He charged at the ex parte hearing that the

reassignment followed "the same pattern of underhandedness and

harassment [that] has continued since 1963. . . ." 

The record reveals no indication that the judge had any

prior knowledge that Salisbury was defendant's mother. Nor was

there any indication that the judge recalled any conversation

with defendant. To argue that the judge should have recused

herself sua sponte on the assumption that a reasonable person

would think that she had schemed to have a case reassigned in

order to obtain revenge based on a long since terminated

disciplinary proceeding, or that she willingly joined a thirty-

two year old conspiracy, is too fanciful for further comment.

11 - 13. Miscellaneous challenges. 

Several alleged errors are so insubstantial that they may be

quite summarily addressed. Number 11 is that a motion for

mistrial should have been granted based on a ten-day delay in the

-23-

trial occasioned by the collapse and medical treatment of defense

counsel. The court's narration of the sequence of events and the

considerations underlying the delay completely persuades us of

the propriety of her decisions. 

Number 12 attacks a conference between the judge and a

juror, when the juror refused to reenter the jury room. Whether

or not all counsel agreed that the judge should confer alone with

the juror -- as the government contends, with some confirming

indication in the record -- it is clear that no objection was

voiced when the court reporter read to counsel the judge's in

camera conversation with the juror. Although defense counsel

filed a post-trial affidavit saying that the juror had been

coerced by other jurors, there was no evidence of any extraneous

influence and the juror herself did not contact the court. A

jury verdict is not so easily impeached. See United States v. 

Norton, 867 F.2d 1354, 1366 (11th Cir. 1989). There was no 

error.

No. 13 alleges ineffective assistance of counsel, but, as we

have often held, where the record, as here, does not contain all

the relevant facts, direct appeal is not the route. Absent

"extraordinary circumstances," the proper vehicle is 18 U.S.C. 

2255. United States v. Bergodere, 40 F.3d 512, 517 (1st Cir. 

1994).

14. Refusal of personal voir dire. Appellant alleges error 

in the court's refusal of his request to voir dire personally

prospective jurors. Local Rule 15 provides that at the close of

-24-

examination of jurors by the court, "the court shall afford

counsel an opportunity to further interrogate the jurors."

Although a pretrial order had required each side to submit a list

of all questions that the court was requested to ask of

prospective jurors, defendant did not submit such a list. The

judge conducted the questioning herself and, at the end, asked

defendant for additional suggestions. He offered four: whether

prospective jurors would be prejudiced if they heard disparaging

remarks about the police, whether they would be offended by

obscene remarks, whether they understood and respected the role

of a pro se litigant, and whether they would be adversely

affected if they knew a defendant had a criminal record.

The court correctly refused the last instruction, since it

was not then clear that prior criminal records would be admitted

into evidence. It had interrogated a number of jurors about

their knowledge of and relations with law enforcement personnel.

While not in the precise form advocated by defendant, these

questions accomplished roughly equivalent inoculation against

adverse reaction to disparagement. The court gave a respectful

and fair instruction about pro se representation. What it did

not give was any instruction concerning possible adverse

reactions to obscene language. 

It may well be that the court reasoned that defendant's

failure to submit a list of suggested questions stripped him of

the privilege afforded by Rule 15. The government, however,

proffers no reason for noncompliance with a rule that is facially

-25-

mandatory. And defendant justifiably cites United States v. 

Diaz-Villafane, 874 F.2d 43, 46 (1st Cir. 1989) ("Once local 

rules have been promulgated, lawyers and their clients have a

right to place reasonable reliance on them.") But we simply

cannot find that lack of a question addressed to jurors'

reactions to obscenity

mandates reversal. In the context of the entire case the error

was harmless.

15. Cumulative errors. Appellant argues that even if 

individual errors do not mandate reversal, the cumulative impact

of a number of errors does. But our analysis reveals, for the

most part, an absence of error. The few instances in which we

have invoked harmless error fall far short of revealing

"pervasive unfairness or any error or combination of errors that

deprived the defendant[] of due process," United States v. 

Brandon, 17 F.3d 409, 456 (1st Cir. 1994). 

16. Sentencing Guideline issues.  

a. Defendant first argues that his offense level should

have been determined by U.S.S.G. 2B3.1, the robbery guideline,

instead of 2X1.1, the conspiracy guideline. He claims that the

former does not permit added adjustments for intended conduct --

several of which were imposed by the district court -- while the

latter explicitly allows adjustments "for any intended offense

conduct that can be established with reasonable certainty."

Section 2X1.1(c)(1) specifies that when a conspiracy is

expressly covered by another guideline section, the other

-26-

guideline should be applied rather than 2X1.1. In this case we

deal with a Hobbs Act conspiracy under 18 U.S.C. 1951. Until

November 1, 1993, U.S.S.G. 2E1.5 (Hobbs Act Extortion or

Robbery) signalled that a violation of 18 U.S.C. 1951 should be

governed by 2B3.1.

This guideline was deleted as of November 1, 1993, however,

leading the Second Circuit in United States v. Amato, 46 F.3d 

1255, 1261 (1995), to conclude that "[t]he deletion of 2E1.5,

with its cross-reference to 2B3.1, deletes the provision of the

Guidelines that provided the `express' reference making 2X1.1

inapplicable." We agree with this conclusion, and reject the

earlier cases cited by defendant. The bare reference to 18

U.S.C. 1951, along with several other statutes, in the

"Statutory Provisions" section of the Commentary in 2B3.1 does

not rise to the level of constituting express coverage. We also

reject defendant's argument that Amato involved a faulty reading 

of the significance of the deletion of 2E1.5.

This determination forecloses defendant's argument that

adjustments for specific offense conduct were impermissible here

because they are not allowed under 2B3.1.

b. Defendant challenges the sufficiency of the

evidence for several adjustments to the base offense level. The

first such issue arises from the court's action in increasing his

offense level by six levels for the intended use of a firearm,

which was, although not discharged, to be "otherwise used" as

opposed to "brandished, displayed or possessed." 

-27-

2B3.1(b)(2)(B). It is clear from the taped conversations that

defendant instructed the detectives about the possible need for

guns to threaten and perhaps shoot guards at the armored car

facility. Moreover, the very robbery envisaged would inherently

involve the likelihood of confrontation with guards and the use

of weapons. There was no error in making this adjustment.

A similar set of circumstances justified the court in

imposing a two-level increase for restraining a person in the

commission of the offense under 2B3.1(b)(4)(B). Defendant had

outlined how a guard would be caught, handcuffed, and mouth

sealed with duct tape. Restraint of some such fashion was to be

expected in the type of robbery contemplated.

The court also imposed a six-level enhancement under

U.S.S.G. 2B3.1(b)(6)(G) to reflect an intention to inflict a

loss between $2.5 million and $5 million. The vice-president of

the Meehan Armored Car company testified that the value of the

various precious metal shipments stored overnight in the

Woonsocket facility averaged $5 million. These were the

materials that the guards would pick up at 3 a.m. for delivery in

New York City. Defendant would require proof of the exact value

of the shipment on a given day. But his planning did not

pinpoint a date certain. The court was well within reason in

basing the enhancement on the range it chose. Defendant fares no

better in his equal protection argument based on the court's

finding that codefendant Grelle's sentence should reflect a

smaller amount. Grelle's situation was different; the jury could

-28-

not, after all, reach a verdict as to him; the sentences were

truly individualized, reflecting differences in knowledge. 

A five-level increase for bodily injury was sufficiently

founded on record statements by defendant; it does not

necessarily overlap with the enhancement based on restraint,

since different actions could be taken against the two guards. A

two-level enhancement for obstruction of justice was based on the

court's conclusion that defendant's testimony was false. While

defendant maintains that he was just an accomplished prevaricator

in his talks with the detectives, he obviously ran the risk that

he would be considered by judge and jury a prevaricator about his

alleged prevarications.

c. Factual Impossibility: a bar to enhancements? 

Defendant argues that even if factual impossibility is not a

defense to conspiracy, enhancements should not be imposed because

the substantive offense could not have occurred. His attempt to

distinguish United States v. Chapdelaine, 989 F.2d 28, 35 (1st 

Cir. 1993), which involved an attempted robbery that misfired

because the putative robbers arrived after their target truck had

left, does not carry the day. In both Chapdelaine and this case 

the defendants were convicted of conspiracy, and in both

completion of the planned action had in fact been rendered

impossible. That no witness contradicted defendant's testimony

that he knew that the armored car had left the facility is of no

consequence; his conviction stemmed from the jury's belief that

he intended to commit the robbery. 

-29-

-30-

CONCLUSION CONCLUSION

In sum, we have carefully surveyed all of the arguments that

defendant has vigorously and thoroughly made. The trial and

associated proceedings were both complex and demanding on all

concerned. But while undoubtedly not perfect, the trial met the

basic standard of fairness. The judgment is accordingly

AFFIRMED. 

-31-