USCA1 Opinion

 

 [NOT FOR PUBLICATION] United States Court of Appeals For the First Circuit ____________________ No. 95-2031 UNITED STATES OF AMERICA, Appellee, v. ROBERT M. JOOST, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Mary M. Lisi, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cummings,* Circuit Judge. _____________ ____________________ Robert Joost on brief pro se. ____________ Kenneth P. Madden, Assistant United States Attorney, and Sheldon _________________ _______ Whitehouse, United States Attorney, on brief for appellee. __________ ______________________ ____________________ August 7, 1996 ____________________  ____________________ *Of the Seventh Circuit, sitting by designation. COFFIN, Senior Circuit Judge. Defendant Robert Joost was _____________________ convicted by a jury of conspiracy to obstruct, delay and affect commerce by robbery of gold from an armored car, in violation of 18 U.S.C. 1951 (the Hobbs Act).1 He filed this appeal pro se, ___ __ alleging a host of errors. Finding none of them to affect the integrity of the conviction, we affirm.2 FACTUAL BACKGROUND FACTUAL BACKGROUND In March 1994, an informant, Tracy, introduced defendant to two undercover Rhode Island detectives, DelPrete and O'Donnell, who were investigating the manufacture of counterfeit Foxwoods Casino (Connecticut) slot machine tokens by defendant and others. During the ensuing months, defendant supplied the detectives with many such tokens, which the detectives said they were able to exchange for cash at the cashier's cage through a cousin of one of them. On April 24, 1994, defendant asked the detectives to join him in robbing a Meehan armored car that regularly carried gold to New York. He said he had earlier assembled a gang for this job and had made plans that he now sought to reactivate. In  ____________________ 1 The same jury was unable to reach a verdict on a co- defendant, Grelle, who later pled guilty. 2 Defendant also was charged with two additional offenses. His conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g), is being vacated in a decision issued simultaneously with this one because of the trial court's erroneous refusal to give an instruction on entrapment. United ______ States v. Joost, No. 95-2032 (1st Cir. July xx, 1996). An ______ _____ indictment alleging interstate theft and counterfeiting, in violation of 18 U.S.C. 371 and 487, was dismissed without prejudice. -2- subsequent conversations in May defendant said that the company had changed its vehicle from a truck to a van. On May 28, defendant, Grelle, and the two detectives drove to Pennsylvania to carry out a robbery of a warehouse or tractor/trailer, but were intercepted by a prearranged investigative stop in which police confiscated burglar tools supplied by defendant. Further talk about the Meehan job led to a surveillance in woods near the armored car facility on the night of June 29-30. Defendant had said that the vehicle carried up to $6 million in gold, and that Leach & Garner was one customer. He said that guards would arrive at about 3:00 a.m., that one would leave first for the vehicle and another would follow. Defendant's plan had two of his team rushing the first guard while a third would alert them to the approach of the second guard, both of whom would be seized, and shot if necessary with a silencer. The robbery aborted when the guards failed to appear. Executives of both Leach & Garner and Meehan corroborated the pick-up time (between 4:30 and 5:30 p.m.), the value of the shipment (averaging $5 million), overnight storage at Meehan's Woonsocket facility, the arrival of two guards at 3:00 a.m., and the change in April 1994 from a truck to a van. Defendant testified that he had gotten his information from a prison roommate, used them in a novel he was writing, and brought up the armored car project in order to sustain the interest of the detectives until he, defendant, could meet and establish his own -3- connection with the "cousin" in the casino's cashier's cage. He had never intended to follow through on an actual robbery. Insofar as additional facts may be relevant on particular issues, they will be incorporated into the following discussion. DISCUSSION DISCUSSION Defendant represented himself at trial during presentation of the government's case; after the government rested, he requested standby counsel to take over. In this appeal, he resumes self-representation, and has briefed sixteen issues. While some merit more discussion than others, we shall follow the sequence in which both defendant and the government have presented their positions.  1. "Other Acts" Cross Examination. ______________________________ Defendant's basic theme, introduced in his opening and reiterated in his testimony, was that he did not engage in armed robberies, that he was fully aware of the heavy penalty imposed on a convicted felon found in possession of a firearm, and that his many discussions with the detectives concerning past and future criminal projects were fanciful tales designed to sustain their interest until he could establish his own modus operandi with the casino's cashier. The government sought to rebut defendant's claim of lack of intent to rob by asking O'Donnell about the conversations defendant had had with the detectives concerning various criminal ventures. On objection, the court refused to allow such questioning, deeming prejudice to outweigh relevance at that -4- point, but noting that the ruling was "subject to whatever else is going to come out." Defendant subsequently took the stand and testified at length about his lack of intent to rob the armored car.  When the government proposed to cross examine defendant about his various proposals to the detectives, the court deferred ruling and further questioning pending resolution of the question whether, if defendant invoked the Fifth Amendment, all of his testimony should be stricken. The court subsequently became satisfied that defendant's taking the Fifth Amendment on collateral matters would not affect his prior testimony. It therefore allowed the government to ask some twenty-three questions about defendant's conversations or actions concerning proposed thefts from a UPS van, an American Legion hall, and a Pennsylvania warehouse, and delivery of a firearm to the detectives. Defendant, in the presence of the jury, invoked the Fifth Amendment as to each question.3 He now makes two arguments. First, he asserts that the court improperly failed to balance prejudice against relevance, although he undercuts this argument by observing, "At best, this `evidence' was merely cumulative." We think it clear that the court was fully aware of its responsibilities. It earlier had  ____________________ 3 In defendant's subsequent prosecution for being a felon- in-possession of a firearm, see supra at n.2, his defense of ___ _____ entrapment relied on a full disclosure of all of these conversations and actions, which he characterized as fanciful fiction, devised to induce the detectives to continue their dollars-for-tokens support. -5- rejected the proffered line of questioning and permitted it only after defendant testified extensively about his lack of intent. While, as always, explicit findings would have avoided any issue, we do not deem this an abuse of discretion. See United States v. ___ _____________ De La Cruz, 902 F.2d 121, 123 (1st Cir. 1990). __________ Defendant's second argument is that there was no "real evidence" or responses from him backing up the insinuations of the prosecutor. But this is not a situation where the prosecutor was flying blind and asking questions without any legitimate reason. Some of the subject matter -- the trip to Pennsylvania to rob the warehouse -- was already in evidence; and both sides were fully aware that most of the relevant conversations had been taped. The government's attempt to elicit the same information from its witness had been foreclosed. Defendant, who had the option of convincing the jury of his "version of the facts and his reliability as a witness, [or] not to testify at all [,] . . . cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute." Brown v. United States, 356 U.S. 148, 155-56 (1958). _____ _____________ Moreover, this objection was not effectively raised at trial. Only two of the twenty-three questions were objected to on the ground of "lack of evidence." Both of these concerned whether defendant had looked at the American Legion building, but other questions had been asked without objection concerning the plan to rob that building.  -6- 2. Rulings admitting evidence. __________________________ a. O'Donnell testified about a conversation with codefendant Grelle, in which Grelle told of his son's involvement in an armored car robbery. The testimony was promptly struck and a cautionary instruction given. After a recess both Grelle and defendant moved for a mistrial. The linkage between Grelle's son and defendant is tenuous and remote. This is not mistrial material. b. The informant Tracy at one point testified that one reason why he did not tell defendant that O'Donnell and DelPrete were really state troopers was concern for his own safety. An objection was overruled. But earlier Tracy had given the same reply in direct examination by defendant. Moreover, this adds nothing to defendant's own talk about being prepared to shoot the armored car guards. If error, it was harmless. c. The government asked defendant if he had been convicted of a conspiracy to violate civil rights by murder. Objection to the question was overruled. Defendant answered by saying, "That's not true. It was by death resulting." Then, after defendant repeated that the conviction was for "conspiracy to violate the civil rights of a citizen, death resulting," the prosecutor interjected, "By killing; conspiracy by killing?" Defendant answered, "Well, yes. There was a death resulting," just before objection was made and overruled. A reading of United States v. Guillette, 547 F.2d 743, 748- _____________ _________ 49 (2d Cir. 1976), reveals that a prospective witness in a -7- prosecution against this defendant and another had been killed by a bomb activated when opening the front door of his house. Defendant argued that it had been installed by the victim as a booby trap aimed at him and his codefendant, who were searching for him to prevent him from testifying. The Connecticut trial court refused to charge that such a fact, if found true, would exonerate defendant. The Second Circuit agreed, holding that the defendants "would still be considered in the chain of legal causation if the immediate cause of death -- setting a bomb as a booby trap -- was a foreseeable protective reaction to their criminal efforts to locate and dissuade him from testifying." The court, in discussing another issue, even referred to "the murder of LaPolla [the victim]." Id. at 755. The questions asked __ did not mischaracterize the conviction in any significant way. Defendant presents four other issues of this nature but either the objections were sustained or no objection was made; all are insubstantial. 3. Limiting examination and refusing offer of proof. ________________________________________________ From two days of his cross-examination of O'Donnell, spanning 174 pages of transcript, defendant distills two asserted errors. One rises out of a specific limitation on further cross by the court that prevented defendant from inquiring into O'Donnell's misreading of a telephone number -- to show that he might also have misread a gesture defendant had made. This is obviously within the discretion of the court.  -8- The second was merely a final limitation of one more hour (instead of two), and subsequent 20 and 5 minute warnings. When defendant wished to make an "offer of proof" of the remaining questioning he wished to do (which would have centered on missing or defective tapes), the court refused. We cannot contemplate how such actions, after two days of cross examining one witness, could be held an abuse of discretion. A final asserted error was the ruling preventing defendant from telling about another armored truck fantasy he had told the detectives, to prove he was just a storyteller. There already were quite enough of these to allow defendant to argue his version. 4. Directing court reporter to read her notes of tape. __________________________________________________ After the jury reported to the court that a tape recording was inaudible, the court told the jury to make another effort. Then, following a subsequent request from the jury, the court ordered the court reporter to read her notes made earlier from the recording. After she concluded, counsel for defendant objected, saying that he had been comparing what was being read with the transcript of the tape, and found some misidentifications. He mentioned that at one point the reporter attributed some of the detectives' statements to one or both defendants. It is of course the case that the tapes, not the transcript, constitute evidence. United States v. Richman, 600 F.2d 286, 295 _____________ _______ (1st Cir. 1979). But it is within a judge's discretion to allow -9- a reporter to read back testimony, United States v. Akitoye, 923 _____________ _______ F.2d 221, 226 (1st Cir. 1991), and such principle would seem to apply here. In any event, we see no possibility of prejudice. O'Donnell had testified extensively about the events and conversations on the evening of June 29-30, the subject of the tape recording. Defendant has pointed to no discrepancy in the courtreporter's reading of her notes that could have damaged him. 5. Dismissal of two jurors. _______________________ During the trial, on April 7, 1995, defendant's counsel became ill. When it was apparent that the trial would be suspended for an additional week, the court was informed that two jurors had prepaid for vacations that were scheduled to begin the week when trial would resume. The court announced to counsel for all parties in a telephone conference call that the jurors would be excused. There was no objection. Defendant claims not to have known of this action until shortly before trial resumed. Defendant first argues that a scheduled vacation is not a legitimate reason to excuse a juror, under Fed. R. Crim. P. 24. Under the circumstances, this was within the sound discretion of the court, United States v. Corsino, 812 F.2d 26,33 (1st Cir. ______________ _______ 1987), and in any event this issue was not presented to the court. A second argument is that defendant himself was not involved in the telephone conference. While a party must be represented by counsel in such conferences, there is no constitutional right -10- to be present when dismissal of a juror is discussed. See United ___ ______ States v. Brown, 571 F.2d 980, 986-87 (6th Cir. 1978). There was ______ _____ no error in dismissing these jurors. 6. Composition of grand and petit juries. _____________________________________ Defendant moved to dismiss the indictments in this and the felon-in-possession case for failure to comply with the Jury Selection and Service Act of 1968, 28 U.S.C. 1861-1878 (the Act), and the Fifth and Sixth Amendments, and to stay proceedings until valid petit juries could be drawn. After hearing argument, the court refused to hold an evidentiary hearing and denied the motion. Defendant raises four issues. a. Delay. Defendant claims that delay in making _____ available to him jury information denied him due process and equal protection. Although the Magistrate Judge granted defendant access to the master jury wheel and the qualified jury wheel in October, 1994, this did not result in any action until February 17, 1995, when the court, after a conference requested by defendant, ordered both wheels to be delivered to defendant. At a hearing on February 28, defendant, who had already received the district's jury plan and the two wheels, sought juror questionnaires and computer programs used to achieve a random pick. The court granted access to defendant's counsel to examine the questionnaires. Defendant sought thirty additional days in which to prepare his motion to dismiss; the court granted twenty-three days. No request for additional time was made and no showing was made of additional information needed.  -11- The court ruled that defendant had sufficient time to examine the material, noting that further analysis was unlikely to lead to new information. We think this judgment well within the court's discretion. b. Limiting access to materials. At a pretrial _______________________________ conference on March 22, 1995, defendant sought computer programs used to select the master and qualified jury wheels, names, addresses, and telephone numbers of computer operators and programmers, documents used to process juror questionnaires, a copy of the petit and grand jury venires, and the names and townships of the grand jurors who returned the two indictments. The court, after noting that production of records used by the clerk in the jury selection process is limited to what is necessary to prepare a motion asserting a substantial failure to comply with the Jury Selection and Service Act, see 28 U.S.C.  ___ 1867(d), denied the request, holding that defendant had not submitted a sufficient basis for production of these additional materials.  Defendant argues on appeal that his figures had revealed a flaw in the randomness of Yale's computer program, which was used to develop the master and qualified wheels. As an example, he points out that Providence citizens comprised 13.46 percent of the names on the master wheel but only 8.59 percent of the qualified wheel. He contends that this discrepancy demanded further inspection, particularly in light of past glitches in Yale's computer programming that resulted in the complete -12- exclusion of persons from the large communities of Hartford and New Britain from the qualified wheel and master wheel, respectively. See United States v. Jackman, 46 F.3d 1240 (2d ___ _____________ _______ Cir. 1995); United States v. Osorio, 801 F. Supp. 966 (D. Conn. _____________ ______ 1992). Such a showing falls far short of demonstrating a likely substantial noncompliance with the Act. Unlike the situations described in Jackman and Osorio, substantial numbers of _______ ______ Providence citizens were on both lists. In light of the considerable information already made available to defendant and the extensive memorandum and exhibits that he filed with his motion to dismiss, the defendant bears a considerable burden of justifying what would amount to both a considerable intrusion on people's work and time and substantial further delay of the trials. The court did not abuse its discretion in refusing further inspection. See United States v. Davenport, 824 F.2d ___ ______________ _________ 1511, 1514-15 (7th Cir. 1987). c. Evidentiary hearing. Defendant charges the court ___________________ with error in denying him an evidentiary hearing on his motion to dismiss the indictments. Under 28 U.S.C. 1867(d), if a movant submits a sworn statement asserting facts which, if true, would impeach the jury selection process, he may present testimony of the clerk or jury commission. The district court, in denying an evidentiary hearing, referred at one point to the lack of an oath before a notary public. But defendant had signed his statement -13- "under penalty of perjury," which is sufficient under 28 U.S.C.  1746.4 The court, however, also noted this circuit's strict adherence to "the gatekeeper prerequisites" of 1867(d). See ___ United States v. Foxworth, 599 F.2d 1, 3 (1st Cir. 1979); United _____________ ________ ______ States v. Marrapese, 610 F. Supp. 991, 996 (D. R.I. 1985). It ______ _________ went on to hold that the "purported affidavit is nothing more than a generalized recitation of self-serving conclusions, speculation and conjecture." Our reading of the affidavit confirms this conclusion; its most salient statements assert discrimination against non-whites, poor, and certain minorities, and that the master and qualified wheels were skewed to underrepresent such classes. But defendant argues that his affidavit refers to "data he has supplied in the attached Motion to Dismiss" and that the motion to dismiss refers to "the accompanying Memorandum of Law." The memorandum, signed by defendant, consists of seventeen pages and derives the facts it relies on from an appendix of sixteen pages of tables and nine pages of graphs. The tables, with no indication of source, break down the population of the various towns and cities into various categories: income, non-white, occupation, education, language, ancestry. Pages of data from the 1990 census extend these  ____________________ 4 28 U.S.C. 1746 reads in relevant part, "Wherever . . . any matter is required . . . to be supported . . . by the sworn . . . statement, . . . such matter may, with like force and effect, be supported . . . by the unsworn statement, in writing of such person which is subscribed by him, as true under penalty of perjury . . . ." -14- classifications to include employed females, households receiving public assistance, and persons over 65 possessing no vehicle. The entire package is so unfocused, so often irrelevant, and so seldom tied to verifiable sources that to declare that it should be considered as integrated with and incorporated into the affidavit, the only document that vouches for truth, would undercut the whole purpose of the requirement of 1867(d): to enable a court to review a challenge to jury composition and "swiftly dispose of it if it fails." Marrapese, 610 F. Supp. at _________ 996 (quoting legislative history). See also Foxworth, 599 F.2d ___ ____ ________ at 3.  We therefore do not fault the court for its ruling. But we also note that defendant was not, in all likelihood, prejudiced by the ruling. The court heard a fairly detailed summary of expected testimony from the clerk and an extensive offer of proof of defendant's expert, a candidate for a Ph.D. degree in statistics and applied mathematics. In addition, it had read all of the motion papers, the memorandum, and the appendix.  d. Fair cross-section. Defendant's substantive claim is __________________ that non-whites and lower economic classes have been systematically excluded from the jury selection process in violation of the Sixth Amendment. Defendant contends that this underrepresentation results inherently from reliance on voter registration lists, magnified further by program error or malfeasance. In support of his theory, he cites data specific to Providence, which has a non-white population of nearly 30 -15- percent: the city contains 15.72 percent of the state's population of 18 and over, yet accounts for only 14.25 percent of registered voters, 13.46 percent of citizens included in the master wheel, and 8.59 percent of those in the qualified wheel. In order to make out a prima facie violation of the fair cross-section requirement of the Sixth Amendment, the defendant must show (1) that the group allegedly underrepresented is a distinctive group in the community, (2) that its representation in the venires from which juries are chosen is not fair and reasonable in relation to the total number of such persons in the community, and (3) that such underrepresentation stems from systematic exclusion of the group from the jury selection process. Duren v. Missouri, 439 U.S. 357, 364 (1979). _____ ________ The district court assumed that the first requirement -- distinctiveness -- was met as to non-whites and low income persons. We also assume the point. In moving on to the issue of fair and reasonable representation, we must reject defendant's first proposition cited above. An assault on voter registration lists must be based on something more than the general observation that non-whites and low income people may tend to register to vote much less than more affluent or white people do. Davenport, 824 F.2d at 1514-15. Nor do "numerical disparities _________ resulting from the use of voter-registration lists . . . violate a defendant's Sixth Amendment rights." United States v. Ireland, _____________ _______ 62 F.3d 227, 231 (8th Cir. 1995). -16- When we further consider defendant's statistical presentation, we recognize a significant problem: rather than count non-whites and low income people on the voter registration lists, and the master and qualified jury wheels, defendant uses Providence as a surrogate for both groups. Defendant's premise is somewhat appealing, but we are not convinced that such an approach is permissible. Non-whites and low income people may very well be fairly represented in both wheels whether or not Providence is. And we have the further doubt created by the absence of information concerning the proportion of Providence's non-white (or for that matter its low income) population which has registered to vote. But if we overlook these questions, we still face the facts, as did the district court, that the absolute disparity between Providence's representation in the voter registration list and that in the master jury wheel is .79% (14.25% - 13.46%); and that the absolute disparity in its representation in the master jury wheel and in the qualified jury wheel is 4.87% (13.46% - 8.59%). Even the broadest potential comparison, between Providence's representation in the state's population of 18 and over and its representation in the qualified jury wheel, yields an absolute disparity of only 7.13% (15.72% - 8.59%). As we recognized in Hafen, 726 F.2d at 23, absolute disparities of up to ten percent _____ are widely conceded not to constitute underrepresentation.5 See ___  ____________________ 5 Absolute disparity measures the difference between the percentage of a distinctive group in a certain population and the percentage of that group in a subset of that population. In the -17- also Ramseur v. Beyer, 983 F.2d 1215, 1232 (3d Cir. 1992) (14.1% ____ _______ _____ "borderline"); United States v. McAnderson, 914 F.2d 934, 941 _____________ __________ (7th Cir. 1990) (8% is de minimis); United States v. Pepe, 747 ______________ ____ F.2d 632, 649 (11th Cir. 1984) (7.6% "well within . . . limits"); United States v. Butler, 611 F.2d 1066, 1069-70 (5th Cir. 1980) _____________ ______ (under 10% permissible). We see no reason to depart from this standard. We think it strikes a correct balance between avoiding egregious discrimination and becoming enmeshed with statistical approaches aimed at unrealistic fine tuning. As for Duren's third prong, the requirement that systematic _____ exclusion be shown, we have already ruled out reliance simpliciter on voter registration lists. What would have to be ___________ demonstrated would be either "the use of suspect voter- registration qualifications or discriminatory administration of the jury-selection procedure." Ireland, 62 F.3d at 232. But _______ voter qualification has never been in issue and the only showing concerning creation of the qualified wheel from the master wheel is defendant's offer of proof that a court officer would testify that persons were selected at random. Defendant also raises the possibility of abuse because names are drawn for new venires from  ____________________ jury selection context, this figure is generally achieved by subtracting the percentage of a group on the jury wheel from the percentage of that group in the community. Joost has suggested alternative methods, but the absolute disparity test is appropriate where, as here, the allegedly underrepresented group constitutes a very small proportion of the total population. See ___ United States v. Pion, 25 F.3d 18, 23 (1st Cir. 1994); United _____________ ____ ______ States v. Hafen, 726 F.2d 21, 23-24 (1st Cir. 1984). ______ _____ -18- a stable qualified list, and someone, sometime, could make improper use of such a list. This is too remote to be substantial. In short, the challenges to the juries were properly dismissed.  7. Propriety of Instructions. _________________________ Defendant lodges seven claims of error in instructing the jury. Only three merit specific treatment. a. The first contention, that the court refused to give an instruction on the intent necessary to violate the Hobbs Act, is somewhat mystifying. Defendant states in his reply brief that both an intent to agree and an intent to execute the agreement are necessary. But he acknowledged that he was writing without access to the record. In fact, the precise instruction he seeks was given by the court. b. Defendant charges error in the court's instruction that the jury could consider his invocation of the privilege against self incrimination in evaluating his testimony. A court may instruct a jury to go further than the court did in this case, i.e., that the jury could draw an adverse inference. See ___ Caminetti v. United States, 242 U.S. 470, 494 (1917); United _________ ______________ ______ States v. Kaplan, 832 F.2d 676, 684 (1st Cir. 1987). Defendant ______ ______ has confused a situation where, as here, a person (whether a party or a non-party witness) invokes the Fifth Amendment on a matter relevant to the issues before the court and the situation where a person invokes the privilege when asked about a matter -19- wholly beyond the scope of the issue at hand, as in United States _____________ v. Nunez, 668 F.2d 1116, 1122-23 (10th Cir. 1982). _____ c. The court charged that factual impossibility, which occurs "when extraneous circumstances unknown to the Defendant . . . prevent the consummation of the intended crime," is not a defense. Defendant claims that this was not applicable because he knew at the time that the armored car was not stored in Woonsocket. But the jury need not have believed him. d. The other challenges to instructions are even less weighty. As to two, there was no objection raised after the instructions. As for the court referring to Tracy as both an informant and an accomplice, the status of informant alone justified the charge. And the charge as a whole left no doubt as to the law that defendant was accused of violating. -20- 8. Violation of Rule 30. ____________________ Fed. R. Crim. P. 30 requires that opportunity be given a party to object to an instruction out of the hearing and presence of the jury. As noted above, the jury twice requested that the court reporter read the notes that she made from the June 29 tape recording. On the first occasion, the court told the jury first to listen to the tape and that, if necessary, the reporter could later read her notes. When asked if he had any "problem" with that, counsel for defendant stated that the tape, not what the reporter heard, was the evidence. When the jury made its second request for the reporter's notes, the court asked counsel if he wished to say anything. Counsel stated that he had the same objection. When the jury retired, counsel moved unsuccessfully for a mistrial on the ground that Rule 30 had been violated. The government argues that Rule 30 is not applicable, since the court was not giving any instructions on the law, but merely making a trial ruling such as requiring a witness to answer a question. We agree. The entire focus of the rule is on the instructions on the law given by a judge at the close of the trial. The objection addressed by the rule is one made to "any portion of the charge or omission therefrom." The incident at issue here was not within the compass of Rule 30.  9. Playing excerpts of tapes. _________________________ Many tape recordings were made of defendant's conversations with the detectives. Excerpted portions of eight of these were allowed to be played to the jury. Defendant objected to the -21- playing of each tape, usually on three grounds: authenticity, defective chain of custody, and lack of completeness. He did not elaborate on his objections, nor did he suggest additional portions that should be played. He now asserts that he wanted the jury to hear how the conversations led up to the excerpted portions, so that the jury would see that discussions of particular robberies were just part of "a larger plethora of stories Joost was telling the agents and that he was the _______ consummate prevaricator." Fed. R. Evid. 106 allows a party to supplement part of a recorded statement when the additional portion "ought in fairness to be considered contemporaneously with it." The trial court must have discretion to conduct what "essentially[] becomes a line- drawing exercise, to be conducted case by case." United States _____________ v. Boylan, 898 F.2d 230, 256 (1st Cir. 1990). When confronted by ______ flat opposition to playing any excerpts of eight time consuming tapes, the court can hardly be faulted for not attempting more sensitive editing. 10. Refusal to recuse sua sponte. ____________________________ Although defendant made no motion for the judge's recusal, he contends that 28 U.S.C. 455 required the judge to recuse herself sua sponte based on an ex parte conference with him. The underlying circumstances involved the judge's role, before her appointment to the bench, as Disciplinary Counsel for the Rhode Island Supreme Court. During the judge's time in that position, one Freda Salisbury filed a complaint against an attorney. -22- Defendant informed the court at the conference that Salisbury was his mother. According to defendant, Salisbury had harsh words with someone in the Disciplinary Counsel's office. The complaint was dismissed and defendant spoke to someone unknown to him in that office, making strong criticisms of both the Disciplinary Counsel and the process.  This case was first assigned to another judge. Defendant goes beyond the record to assert that the judge who heard the case "had this case reassigned to herself . . . in order to seek retribution against [defendant] for accusations he had made against her . . . ." He charged at the ex parte hearing that the reassignment followed "the same pattern of underhandedness and harassment [that] has continued since 1963. . . ."  The record reveals no indication that the judge had any prior knowledge that Salisbury was defendant's mother. Nor was there any indication that the judge recalled any conversation with defendant. To argue that the judge should have recused herself sua sponte on the assumption that a reasonable person would think that she had schemed to have a case reassigned in order to obtain revenge based on a long since terminated disciplinary proceeding, or that she willingly joined a thirty- two year old conspiracy, is too fanciful for further comment. 11 - 13. Miscellaneous challenges. ________________________ Several alleged errors are so insubstantial that they may be quite summarily addressed. Number 11 is that a motion for mistrial should have been granted based on a ten-day delay in the -23- trial occasioned by the collapse and medical treatment of defense counsel. The court's narration of the sequence of events and the considerations underlying the delay completely persuades us of the propriety of her decisions.  Number 12 attacks a conference between the judge and a juror, when the juror refused to reenter the jury room. Whether or not all counsel agreed that the judge should confer alone with the juror -- as the government contends, with some confirming indication in the record -- it is clear that no objection was voiced when the court reporter read to counsel the judge's in camera conversation with the juror. Although defense counsel filed a post-trial affidavit saying that the juror had been coerced by other jurors, there was no evidence of any extraneous influence and the juror herself did not contact the court. A jury verdict is not so easily impeached. See United States v. ___ _____________ Norton, 867 F.2d 1354, 1366 (11th Cir. 1989). There was no ______ error. No. 13 alleges ineffective assistance of counsel, but, as we have often held, where the record, as here, does not contain all the relevant facts, direct appeal is not the route. Absent "extraordinary circumstances," the proper vehicle is 18 U.S.C.  2255. United States v. Bergodere, 40 F.3d 512, 517 (1st Cir. ______________ _________ 1994). 14. Refusal of personal voir dire. Appellant alleges error _____________________________ in the court's refusal of his request to voir dire personally prospective jurors. Local Rule 15 provides that at the close of -24- examination of jurors by the court, "the court shall afford counsel an opportunity to further interrogate the jurors." Although a pretrial order had required each side to submit a list of all questions that the court was requested to ask of prospective jurors, defendant did not submit such a list. The judge conducted the questioning herself and, at the end, asked defendant for additional suggestions. He offered four: whether prospective jurors would be prejudiced if they heard disparaging remarks about the police, whether they would be offended by obscene remarks, whether they understood and respected the role of a pro se litigant, and whether they would be adversely affected if they knew a defendant had a criminal record. The court correctly refused the last instruction, since it was not then clear that prior criminal records would be admitted into evidence. It had interrogated a number of jurors about their knowledge of and relations with law enforcement personnel. While not in the precise form advocated by defendant, these questions accomplished roughly equivalent inoculation against adverse reaction to disparagement. The court gave a respectful and fair instruction about pro se representation. What it did not give was any instruction concerning possible adverse reactions to obscene language.  It may well be that the court reasoned that defendant's failure to submit a list of suggested questions stripped him of the privilege afforded by Rule 15. The government, however, proffers no reason for noncompliance with a rule that is facially -25- mandatory. And defendant justifiably cites United States v. _____________ Diaz-Villafane, 874 F.2d 43, 46 (1st Cir. 1989) ("Once local ______________ rules have been promulgated, lawyers and their clients have a right to place reasonable reliance on them.") But we simply cannot find that lack of a question addressed to jurors' reactions to obscenity mandates reversal. In the context of the entire case the error was harmless. 15. Cumulative errors. Appellant argues that even if __________________ individual errors do not mandate reversal, the cumulative impact of a number of errors does. But our analysis reveals, for the most part, an absence of error. The few instances in which we have invoked harmless error fall far short of revealing "pervasive unfairness or any error or combination of errors that deprived the defendant[] of due process," United States v. ______________ Brandon, 17 F.3d 409, 456 (1st Cir. 1994). _______ 16. Sentencing Guideline issues.  ___________________________ a. Defendant first argues that his offense level should have been determined by U.S.S.G. 2B3.1, the robbery guideline, instead of 2X1.1, the conspiracy guideline. He claims that the former does not permit added adjustments for intended conduct -- several of which were imposed by the district court -- while the latter explicitly allows adjustments "for any intended offense conduct that can be established with reasonable certainty." Section 2X1.1(c)(1) specifies that when a conspiracy is expressly covered by another guideline section, the other -26- guideline should be applied rather than 2X1.1. In this case we deal with a Hobbs Act conspiracy under 18 U.S.C. 1951. Until November 1, 1993, U.S.S.G. 2E1.5 (Hobbs Act Extortion or Robbery) signalled that a violation of 18 U.S.C. 1951 should be governed by 2B3.1. This guideline was deleted as of November 1, 1993, however, leading the Second Circuit in United States v. Amato, 46 F.3d _____________ _____ 1255, 1261 (1995), to conclude that "[t]he deletion of 2E1.5, with its cross-reference to 2B3.1, deletes the provision of the Guidelines that provided the `express' reference making 2X1.1 inapplicable." We agree with this conclusion, and reject the earlier cases cited by defendant. The bare reference to 18 U.S.C. 1951, along with several other statutes, in the "Statutory Provisions" section of the Commentary in 2B3.1 does not rise to the level of constituting express coverage. We also reject defendant's argument that Amato involved a faulty reading _____ of the significance of the deletion of 2E1.5. This determination forecloses defendant's argument that adjustments for specific offense conduct were impermissible here because they are not allowed under 2B3.1. b. Defendant challenges the sufficiency of the evidence for several adjustments to the base offense level. The first such issue arises from the court's action in increasing his offense level by six levels for the intended use of a firearm, which was, although not discharged, to be "otherwise used" as opposed to "brandished, displayed or possessed."  -27- 2B3.1(b)(2)(B). It is clear from the taped conversations that defendant instructed the detectives about the possible need for guns to threaten and perhaps shoot guards at the armored car facility. Moreover, the very robbery envisaged would inherently involve the likelihood of confrontation with guards and the use of weapons. There was no error in making this adjustment. A similar set of circumstances justified the court in imposing a two-level increase for restraining a person in the commission of the offense under 2B3.1(b)(4)(B). Defendant had outlined how a guard would be caught, handcuffed, and mouth sealed with duct tape. Restraint of some such fashion was to be expected in the type of robbery contemplated. The court also imposed a six-level enhancement under U.S.S.G. 2B3.1(b)(6)(G) to reflect an intention to inflict a loss between $2.5 million and $5 million. The vice-president of the Meehan Armored Car company testified that the value of the various precious metal shipments stored overnight in the Woonsocket facility averaged $5 million. These were the materials that the guards would pick up at 3 a.m. for delivery in New York City. Defendant would require proof of the exact value of the shipment on a given day. But his planning did not pinpoint a date certain. The court was well within reason in basing the enhancement on the range it chose. Defendant fares no better in his equal protection argument based on the court's finding that codefendant Grelle's sentence should reflect a smaller amount. Grelle's situation was different; the jury could -28- not, after all, reach a verdict as to him; the sentences were truly individualized, reflecting differences in knowledge.  A five-level increase for bodily injury was sufficiently founded on record statements by defendant; it does not necessarily overlap with the enhancement based on restraint, since different actions could be taken against the two guards. A two-level enhancement for obstruction of justice was based on the court's conclusion that defendant's testimony was false. While defendant maintains that he was just an accomplished prevaricator in his talks with the detectives, he obviously ran the risk that he would be considered by judge and jury a prevaricator about his alleged prevarications. c. Factual Impossibility: a bar to enhancements? __________________________________________________ Defendant argues that even if factual impossibility is not a defense to conspiracy, enhancements should not be imposed because the substantive offense could not have occurred. His attempt to distinguish United States v. Chapdelaine, 989 F.2d 28, 35 (1st _____________ ___________ Cir. 1993), which involved an attempted robbery that misfired because the putative robbers arrived after their target truck had left, does not carry the day. In both Chapdelaine and this case ___________ the defendants were convicted of conspiracy, and in both completion of the planned action had in fact been rendered impossible. That no witness contradicted defendant's testimony that he knew that the armored car had left the facility is of no consequence; his conviction stemmed from the jury's belief that he intended to commit the robbery.  -29- -30- CONCLUSION CONCLUSION In sum, we have carefully surveyed all of the arguments that defendant has vigorously and thoroughly made. The trial and associated proceedings were both complex and demanding on all concerned. But while undoubtedly not perfect, the trial met the basic standard of fairness. The judgment is accordingly AFFIRMED. ________ -31-